**CITY OF MISHAWAKA, INDIANA, et al., Plaintiffs-Appellees,**

v.

**INDIANA & MICHIGAN ELECTRIC COMPANY, Defendant-Appellant.**

No. 76–2226.

United States Court of Appeals, Seventh Circuit.

Argued April 28, 1977.

Decided Aug. 16, 1977.

Peter J. Schlesinger, New York City, Thomas W. Yoder, Fort Wayne, Ind., for defendant-appellant.

Thomas R. Ewald, Washington, D. C., R. Wyatt Mick, Jr., James J. Olson, Mishawaka, Ind., for plaintiffs-appellees.

Before CUMMINGS, TONE and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

One Michigan and nine Indiana municipalities, members of the Indiana & Michi-

gan Municipal Distributors' Association, filed this antitrust action against defendant, a vertically integrated electric power company which generates, transmits and delivers electric power both to its wholesale customers, including plaintiffs, as well as directly to its own retail customers. Each plaintiff operates its own electric utility through which it purchases wholesale electric power from defendant, then selling and distributing it at retail to industrial, commercial, and residential customers within its corporate limits and in nearby areas.

According to the complaint, defendant is the only firm within its service area that transmits and wholesales electric power and is the plaintiffs' only outside source of supply for wholesale electric power. Eight of the plaintiffs depend on defendant for all the electric power they distribute and sell to their retail customers. The other two plaintiffs, which operate generating facilities, depend on defendant for more than 90% of their requirements for electric power distribution and sale to their retail customers.

Plaintiffs alleged that defendant dominates and controls the distribution and sale of retail electric power within its service area and has acquired four of the twenty municipal electric utilities there since 1957 and unsuccessfully attempted to acquire a fifth. According to plaintiffs,

"The defendant company now controls the distribution and sale of retail electric power in more than 90% of the communities within its service area, while municipally owned and operated electric systems serve retail customers in fewer than 10%." (Complaint ¶ 6.)

Plaintiffs have charged defendant with intentionally monopolizing and attempting to monopolize interstate trade and commerce in the distribution and sale of retail electric power, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), by requiring them and other municipalities to pay since January 13, 1973, a new wholesale price which is substantially higher than the retail price it charges its own industrial customers. Be-

cause of this "price squeeze," the municipalities cannot sell electric power to their own industrial customers at prices that compete with defendant's retail prices. One consequence is that defendant may be able to lease Fort Wayne, Indiana's electric utility system for 35 years. Fort Wayne is the largest city within the defendant's service area which still operates its own electric utility. Other alleged consequences of the new wholesale price are:

1. Plaintiffs' ability to compete with defendant for retail and industrial customers has been impaired.

2. In those municipalities that have absorbed the difference between defendant's higher wholesale price and its lower retail industrial prices, pressure has been put on the municipalities to sell or lease their electric utilities to defendant rather than to continue generating operating losses.

3. In those municipalities that increase their industrial retail prices to the level of the defendant's higher wholesale price to them, the disparity between the municipalities' higher retail industrial prices and defendant's lower retail industrial prices threatens to cause the municipalities' industrial customers to exert pressure on the municipalities to sell or lease their electric utilities to defendant so that those customers can purchase electric power at defendant's lower prices.

By a September 30, 1976, amendment to the complaint, plaintiffs alleged that since July 27, 1976, defendant required them and other municipalities to pay a new higher wholesale price for electric power, resulting in their financial inability to buy power at the defendant's new wholesale price and sell it to industrial customers at prices competitive with defendant's retail prices. In its answer to this amendment, defendant admitted that the Federal Power Commission permitted its higher wholesale rates to become effective on July 27, 1976, subject to refund.[1]

1. In June 1975, defendant filed an answer containing three counterclaims against plaintiffs.

Plaintiffs requested a declaratory judgment that defendant had violated Section 2 of the Sherman Act and an injunction under Section 16 of the Clayton Act (15 U.S.C. § 26) against violating it in the future. They also sought an order ending defendant's present rate structure which requires plaintiffs to pay a higher wholesale price to defendant for electric power than the retail prices at which it sells to its own industrial customers. Under Section 4 of the Clayton Act (15 U.S.C. § 15), plaintiffs claimed damages in excess of $1 million before trebling. The municipalities also sought attorneys' fees.

Subsequently, on May 1, 1974, defendant filed a motion to dismiss the complaint for lack of subject matter jurisdiction or for failure to state a claim or, in the alternative, to stay the court proceedings until the Federal Power Commission should conclude its regulatory proceedings involving defendant's post-January 13, 1973, rates to wholesale customers. Defendant and the Indiana & Michigan Municipal Distributors' Association (of which plaintiffs are members) were parties to these proceedings before the Commission. On May 1, 1975, Judge Grant denied that motion and at the same time filed an extensive opinion disposing of defendant's arguments (App. 11–29). In the opinion, Judge Grant noted that in March 1972, the Indiana Public Service Commission set defendant's new higher retail rates and that in March 1973, the Michigan Public Service Commission approved an increase in defendant's retail rates. Both of these actions were instituted by defendant's July 30, 1971, petitions for new rates filed with each of the state Commissions. In June 1972, defendant submitted proposed increases in the rates charged to its wholesale customers to the Federal Power Commission. The new rates were later made

That pleading need not be summarized herein because it is irrelevant to the issues involved on the interlocutory appeal.

2. On August 13, 1972, the Commission suspended the use of these rates until January 13, 1973, the date involved in the original complaint herein. After an appeal to the District of Columbia Circuit by defendant on the grounds that the effective date should be July 14, 1972,

effective on August 13, 1972,[2] but the Commission provided that if it determined that said rates were unjust or unreasonable, it might order defendant to refund the excess to its customers. The Commission began its hearings on the lawfulness of these new wholesale rates on January 31, 1974.

Defendant contended that its retail rates, set by the state utility commissions, were immune from attack under the Sherman Act. The court held that under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, it did not have authority to intrude upon the Indiana and Michigan Public Service Commissions' approval of defendant's retail rates. However, after distinguishing *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525, and *Pennsylvania Power Company v. Federal Power Commission*, 89 U.S.App.D.C. 235, 193 F.2d 230 (1951), affirmed, 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042, the Court found that it had jurisdiction over the subject matter of the action, citing *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; *Keogh v. Chicago & N. W. Ry.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; and *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359. In particular, Judge Grant held that

"Just as the Court in *Otter Tail* was hesitant to conclude that the authority of the Federal Power Commission to order interconnections was intended to 'be a substitute for, or to immunize Otter Tail from, anti-trust regulation for refusing to deal with municipal corporations,' this Court cannot conclude that the Federal Power Commission's authority to review rates was an intended substitute for the anti-trust laws in a situation involving the alleged monopolizing effect of a dual price structure." (mem. op. at 16.)

the Court proclaimed July 14, 1972, to be the effective date but only allowed defendant to collect the difference between its old and new rates from December 14, 1972, onward. *Indiana & Michigan Electric Co. v. Federal Power Commission*, 163 U.S.App.D.C. 334, 502 F.2d 336 (1974), certiorari denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424.

Judge Grant stated that if the Federal Power Commission finally found the defendant's new wholesale rates to be just, the court might be forced to order defendant to initiate a new rate structure, eliminating the dual price system of higher wholesale prices relative to retail prices. On the other hand, if the Commission should find the new wholesale rate to be unjust, he might only enjoin defendant from any future dual system. Consequently the court held that plaintiff had not failed to state a claim upon which relief could be granted.

In conclusion, Judge Grant refused to stay the action until the Federal Power Commission should hand down a final decision because "the lawfulness of the defendant's wholesale rate is not determinative of the issue before" the court (mem. op. 19). The district court ended its opinion as follows:

> "Since it is the initiation of a monopolistic structure that the Court is asked to prohibit and not the rate itself, final action by the agency will not by itself prohibit the problem although it may alleviate it for a time. Furthermore, if the Court found that damages were recoverable in this case and that in determining the damages the final decision of the Commission was necessary and the Commission has not yet ruled on the lawfulness of the wholesale rate the present action could at that time be stayed by the Court for the purpose of awaiting the Commission result." (*Id.*)

Thereafter the case was reassigned to Judge Sharp. On October 22, 1976, he denied defendant's motion to reconsider Judge Grant's order of May 1, 1975. Thereupon,

an interlocutory appeal was taken to this Court and allowed pursuant to 28 U.S.C. § 1292(b). We affirm.

## I. *Exclusive Jurisdiction*

When the district court handed down its opinion refusing to dismiss the complaint and to grant a stay, the Federal Power Commission had ruled that this alleged dual price system and its anti-competitive effects were beyond its jurisdiction (mem. op. 14).[3] However, in *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626, the Supreme Court subsequently held that such an anti-competitive price squeeze between jurisdictional wholesale rates and non-jurisdictional retail rates should be considered by the Commission in fixing rates for interstate wholesale sales. Speaking for a unanimous Court, Mr. Justice White said the Commission can take retail rates into consideration in setting the wholesale rate even though they are outside its jurisdiction. 426 U.S. at 279–282, 96 S.Ct. 1999. The Court explicitly approved the District of Columbia Circuit's conclusion that

> "When costs are fully allocated, both the retail rate and the proposed wholesale rate may fall within a zone of reasonableness, yet create a price squeeze between themselves. There would, at the very least, be latitude in the FPC to put wholesale rates in the lower range of the zone of reasonableness, without concern that overall results would be impaired, in view of the utility's own decision to depress certain retail revenues in order to curb the retail competition of its wholesale customers. 167 U.S.App.D.C. [43] at

---

**3.** The Indiana & Michigan Municipal Distributors' Association sought review of the FPC decision to eliminate from the case all testimony, exhibits and consideration of the price squeeze issue. Appealing to the District of Columbia Circuit, IMMDA requested the FPC to confess error in light of *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626, and obtain a remand to consider the price squeeze issue. On August 13, 1976, the FPC filed such a request. In an initial decision of August 19, 1976, in the wholesale rate case commenced in June 1972,

the administrative law judge recommended that the price squeeze issue be resolved in further proceedings. This was in line with the parties' agreement to dispose of the 1972 wholesale rate case by a financial settlement based on the initial decision without resolving the anti-competitive allegations (Pl. Br. 9–10). These facts were brought to the district court's attention before its October 22, 1976, denial of defendant's Motion to Reconsider, Vacate, Set Aside and Amend [the] Court's Order of May 1, 1975 (D. Br. 5–6). The settlement was approved by the FPC in an order of June 1, 1977.

53, 510 F.2d [1264] at 1274. (Footnote omitted.)" 426 U.S. at 279, 96 S.Ct. at 2004.

Such a remedy would only operate against the jurisdictional rate.[4]

Nothing in the Supreme Court's opinion in *Conway* suggests exclusive jurisdiction, as defendant concedes (D. Br. 32).[5] Indeed, *Conway* suggests that the FPC remedy is limited to setting the jurisdictional rate somewhere above the lower boundary of the zone of reasonableness. A rate set so low that it would fail to recoup fully allocated wholesale costs seems to be beyond the Commission's power. 426 U.S. at 278, 96 S.Ct. 1999. If the retail rates have been set so low by the state utility commissions that a price squeeze could only be fully remedied by setting the wholesale rates below the lower boundary of the zone of reasonable recovery for fully allocated costs, the squeeze would go unremedied to the extent a wholesale rate set at the lower boundary of the zone of reasonableness did not cure the problem. Although *Conway* was brought to the district court's attention, it refused to vacate its order declining to dismiss the complaint and to stay the action.

Subsequent to *Conway*, the Supreme Court decided *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141, refusing to exempt Detroit Edison's light bulb exchange program from the federal antitrust laws even though it was an approved element of the state rate tariff filed with the Michigan Public Service Commission. Given a complaint that details conduct which, if true, would constitute a substantive antitrust violation, Justice Stevens described two classes of situations involving the interaction of state and federal law where Sherman Act jurisdiction would, nevertheless, be defeated. First, Congress in passing the Sherman Act may not have intended for the Act to apply, in the first instance, to state action. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. Secondly, although originally intended to be covered by the Sherman Act, certain conduct may have become exempted from the Act.

■ In a section of his opinion commanding only a four-judge plurality, Justice Stevens concluded that in *Parker* the

"only Sherman Act issue decided was whether the sovereign State itself, which had been held to be a person within the

---

**4.** A new regulation, 18 CFR § 2.17, entitled "Price discrimination and anti-competitive effect (price squeeze issue)," was issued on March 21, 1977, to implement the Commission's mandate under *Conway*. In the order issuing the regulation, provision was made for the state commissions to be kept informed but, of course, no suggestion was made to force them to change the non-jurisdictional retail rates:

"Both the Federal Power Commission and the NARUC [National Association of Regulatory Utility Commissioners] Board [of Consultants] recognize that state commission participation in rate proceedings before the Commission, particularly in cases involving retail and wholesale rate comparisons, would be desirable, and awareness of the state commission's views on price squeeze issues would be valuable. We, therefore, adopt the NARUC Board's recommendation that in all cases where price squeeze is at issue, the state commission, agency or body which is responsible for regulation of retail rates in the state affected shall be included in the service list maintained by the Secretary under 18 CFR 1.17(c) as if that state commission, agency or body had intervened in the

proceeding. In proceedings where the state commission does not take an active part, the NARUC Board recommends that the Commission encourage FPC staff to confer with state commission staff for the purpose of acquiring information particularly within the knowledge of the state commissions in order to gain a more complete picture of the competitive relationship of respective wholesale to retail rates." (D. Rep. Br. App. A8–A9.)

**5.** Defendant points to one sentence of dicta in Judge Leventhal's opinion for the D.C. Circuit in *Conway* arguably to the contrary:

"The FPC's position would leave a regulatory gap—no institution would have authority to consider an undue preference between wholesale and retail rates, even where that preference was deliberately instituted for the purpose of clogging competition, and to reduce interstate wholesale rates." 510 F.2d at 1272.

Judge Leventhal's opinion does not consider antitrust aspects at all. When read in the context of the opinion as a whole, it is clear that the "institution" meant a regulatory administrative body.

meaning of § 7 of the statute, was also subject to its prohibitions." 428 U.S. at 591, 96 S.Ct. at 3117.

As in *Cantor*, the plaintiff municipalities have named no state officials or state agencies in the complaint, and there is no claim that any state action violated the antitrust laws. See 428 U.S. at 591–592, 96 S.Ct. 3110. Thus under the plurality opinion, *Parker v. Brown* does not even arguably apply to the facts of our case. Nor do Chief Justice Burger or Justice Blackmun's concurrences in *Cantor* give defendant solace. The challenged activity here is a dual rate structure. The state utility commissions have only put the imprimatur of their sanction on the retail rates charged by the defendant. The price squeeze has not been blessed by Indiana or Michigan. The fact that the district court has no authority to maintain a direct attack on the defendant's retail rates does not alter the reality that the state commissions have in no way placed a badge of approval on the defendant's dual rate structure. Consequently, defendant's conduct is not immunized under *Parker v. Brown*.

■ Having decided that the Sherman Act applies in the first instance to the conduct at issue here, we must decide whether an exemption nonetheless has been worked. Justice Stevens, in a portion of *Cantor* subscribed to by a majority of the Court, suggested two geneses for such an exemption. First, it might be unjust to hold a private citizen liable for conduct imposed by the direct command of the sovereign.[6] Second-

ly, if the sovereign is already regulating an area, Congress may not have intended to superimpose the antitrust laws as an additional and perhaps conflicting regulatory scheme.[7]

In *City of Shakopee v. Northern States Power Co.*, Civ. No. 4–75–591 (D.Minn. 1976), a post-*Cantor* case involving a virtually identical dual rate structure creating a price squeeze between the wholesale and retail sale of electric power, Judge Lord concluded that no exclusive jurisdiction existed in the Federal Power Commission because an exemption from the antitrust laws could not be implied. Judge Lord interpreted the first genesis for exemption under *Cantor* to be based on the reasoning that

"if an anticompetitive practice is the product, at least in part, of the company being regulated and could be avoided if the company chose to do so, then the anticompetitive condition is in reality the work of that company and is not 'necessary' to the functioning of the regulatory scheme and will not be immunized from antitrust liability." (mem. op. 6.)

Accordingly, the court noted that, as here, defendant Northern States Power Co. could have avoided the alleged monopolistic position by "tailoring its applications to allow for competitive 'wholesale' and 'retail' power rates" (mem. op. 7) and that, given such company autonomy, this position was not "necessary" to the functioning of the regulatory scheme.

**6.** Although the facts of *Cantor* limited Justice Stevens' consideration to the state sovereign, a finding that conduct arising from the command of the federal sovereign is subject to antitrust liability may be assumed to be similarly unjust.

**7.** If the sovereign is the federal government, the question reduces to the traditional problem of exclusive jurisdiction. Here the conceptual framework is a federal statute post-dating the Sherman Act lodging the responsibility for regulating the conduct in issue in some federal agency and impliedly repealing the application of the Sherman Act as to this specie of conduct.

If the sovereign is the state government, an implied repealer of a federal law such as the Sherman Act is of course foreclosed by the

Supremacy Clause. Presumably, the exemption is created here on the conceptual framework that Congress did not intend the Sherman Act to apply to areas of the economy pervasively regulated by the states. Unlike the *Parker* exclusion, this exemption would not derive from the character of a state's involvement with certain conduct but rather with the quality and scope of the regulatory mechanism imposed by the state over such conduct. The state commissions of Indiana and Michigan are not alleged to have any power to regulate the price squeeze in any sense. Since this conduct is not being regulated by the state commissions, Sherman Act jurisdiction of course is not ousted in favor of state regulation. The defendant does not contend otherwise.

With respect to implying a repealer of the antitrust acts, Judge Lord began with the now settled axiom that after *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, "there can be no doubt about the proposition that the federal antitrust laws are applicable to electric utilities." *Cantor, supra,* 428 U.S. at 596 n. 35, 96 S.Ct. at 3120. Since the antitrust laws are not generically superseded by the regulation of electric utilities,[8] the only question open to debate is whether the particular application of the antitrust laws is irreconcilably repugnant to the operation of the regulatory scheme. Judge Lord decided that there was "little or no apparent conflict between applying the antitrust laws to the type of conduct complained of here and the smooth and efficient functioning of the FPC's regulatory system" (mem. op. 5). As in *Shakopee,* the price squeeze alleged in our case

> "is not between rates set by one regulatory agency, as was the case in *Georgia* [*v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051], but rather is between the 'wholesale' rate set by the FPC and the 'retail' rate over which the FPC has no jurisdiction. Put simply, under these circumstances, antitrust immunity is not 'necessary' to the functioning of the regulatory process because the discrimination is 'external' to that process. The FPC does not control both ends of the discriminatory conduct." (mem. op. 7 n. 6.)

If plaintiff proves it is entitled to relief on the Sherman Act claim asserted in its complaint, the Federal Power Commission's regulatory process would not be disturbed by the court's awarding damages for past anti-competitive conduct or by enjoining future anti-competitive conduct by defendant in making and promoting its rate applications. Thus relief could be granted without the district court's actually becoming involved in the process of setting rates.

Indeed the Federal Power Commission has conceded that it does not have exclusive jurisdiction over conduct such as that alleged here. Following Judge Lord's denial of Northern States Power's motion to dismiss, *Shakopee* is proceeding, we are advised, before the district court and the Federal Power Commission in tandem. On May 23, 1977, the Federal Power Commission released an order in *Northern States Power Company,* FPC Docket No. ER 76–818, stating that the Commission's examination of the alleged price squeeze would not affect the district court action in *Shakopee* because

> "That action seeks damages for allegedly anticompetitive activity that occurred in the past. As the District Court noted in its October 18, 1976, order denying Northern States' motion to dismiss, should Shakopee prove itself entitled to relief the regulatory process would not be disrupted by an award of damages for past conduct nor by an enjoining of certain future conduct. These remedies are beyond our jurisdiction as we cannot look to past rate schedules and, if a price squeeze were found, we could not take any remedial action. Accordingly there is no alternative to this issue being litigated in both forums, one concerning itself with present rates and the other with past rates and possible future conduct."

This ruling equally applies here. Therefore, it is clear that defendant is wrong in asserting that the Federal Power Commission has exclusive jurisdiction over this matter.

## II. *Primary Jurisdiction*

The more difficult question is whether the Federal Power Commission has primary jurisdiction over the price squeeze. Primary jurisdiction is concerned with the

---

8. In order to imply a general exemption for an economic sector of an industry, mere conflicting standards are not enough. This aspect of a regulatory agency's jurisdiction must be "imperative in the continued effective functioning" of the regulatory scheme over the industry as a whole. *Cantor, supra,* 428 U.S. at 596–597 n. 36 and n. 37, 96 S.Ct. at 320. Since *Cantor* distinguished and refused to apply *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463, perhaps defendant's principal case on this ground, no purpose would be served in discussing it further here. See 428 U.S. at 596–597 n. 36, 96 S.Ct. 3110.

proper allocation of responsibilities between the administrative agencies and the courts. "Even when [antitrust actions] and remedies survive and the agency in question lacks the power to confer immunity from [antitrust] liability, it may be appropriate to refer specific issues to an agency for initial determination where that procedure would secure '[u]niformity and consistency in the regulation of business entrusted to a particular agency' or where

> " 'the limited functions of review by the judiciary [would be] more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.' *Far East Conference v. United States,* 342 U.S., [570] at 574–575, [72 S.Ct. 492, 96 L.Ed. 576]." (*Nader v. Allegheny Airlines,* 426 U.S. 290, 303–304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643.)

The defendant argues that since "some facets of the dispute * * * are within the statutory jurisdiction of the [Federal Power] Commission," *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 302, 93 S.Ct. 573, 580, 34 L.Ed.2d 525—here the *Conway*-dictated duty to set the jurisdictional rate with an eye to any price squeeze between it and the non-jurisdictional rate—the Federal Power Commission must be deemed to preempt antitrust jurisdiction. However, that position was also foreclosed by *Otter Tail Power Co., supra.* There only the dissenting Justices would have required the antitrust court to defer to the Commission proceeding. 410 U.S. at 392–395, 93 S.Ct. 1022. The other Justices affirmed a decree under Section 2 of the Sherman Act (except in one respect immaterial here) without requiring a stay where there was only a potential conflict between the federal judicial decree and a future order of the Federal Power Commission. 410 U.S. at 376–377, 93 S.Ct. 1022. Any suspicions that the 4–3 vote in *Otter Tail* impairs its authority seem wholly unwarranted in light of the *Cantor* majority's repeated citations of it with approval. See also *Gulf States Utilities Co. v. Federal Power Commission,* 411 U.S. 747, 758, 93 S.Ct. 1870, 36 L.Ed.2d 635.

Even if it cannot be maintained as a matter of course that as between the dual jurisdiction in the district court and in the Federal Power Commission the jurisdiction in the Commission is primary, it may be that deferral to the Commission makes sense as a matter of judicial administration. If a significant inconsistency between the antitrust action and the regulatory scheme which was certain to arise could be specifically shown to be avoidable by letting the Commission proceed first, deferring to the Commission would be advisable. In addition, if the "adjudication of th[e] dispute by the Commission promises to be of material aid in resolving the [antitrust] immunity question," *Ricci, supra,* 409 U.S. at 302, 93 S.Ct. at 580, or will advance the Court's fact-finding capacity, it may be desirable to hold the antitrust action in abeyance pending the resolution of the proceeding before the Commission. Nevertheless, we hold that the Federal Power Commission does not have primary jurisdiction over the price squeeze.

## A. *Uniformity*

Where uniformity and consistency of the regulatory scheme are at stake, primary antitrust coverage does not necessarily follow even when there is a statutory grant of express immunity as to certain other conduct approved by a federal agency. *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 555 F.2d 687, 691 (9th Cir. 1977). Where there is no statutory grant of antitrust immunity, so that the argument that Congress intended "conduct not within the exemption [to remain] subject to the antitrust laws" is foreclosed (*id.*), the uniformity interests in primary administrative jurisdiction are correspondingly strengthened. But as Chief Judge Browning added:

> "Conduct is not immunized merely because it falls within the jurisdiction of the regulatory agency, as it did in this case. Immunity is not implied merely because the applicable regulatory standard requires the agency to give weight

to antitrust policy, as it did in this instance." (*Id.*)

Indeed, as noted in *Gulf States Utilities Co. v. Federal Power Commission,* 411 U.S. 747, 758–759, 93 S.Ct. 1870, 36 L.Ed.2d 635, the Federal Power Act does not preclude the operation of the antitrust laws even though the Federal Power Commission is required to give weight to antitrust policy. There Justice Blackmun, speaking for six members of the Court, declared that the Federal Power Commission should consider antitrust and anti-competitive issues before authorizing the issuance of securities under Section 204 of the Act (16 U.S.C. § 824c) in order to establish "a first line of defense against those competitive practices that might later be the subject of antitrust proceedings" (411 U.S. at 760, 93 S.Ct. at 1878). This of course does not mean, as defendant urges (Reply Br. 5–6 n.*), that a district court which, as here, has assumed jurisdiction over a price squeeze two years before the Commission agreed to consider it must withhold relief that (as the district court has already indicated) will not interfere with the Commission's rate-making function. In fact, primary administrative jurisdiction based on uniformity grounds is not even an issue in such a factual setting.

As in *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 455, 457, 65 S.Ct. 716, 89 L.Ed. 1051, plaintiffs are seeking to enjoin conduct violative of the Sherman Act and to recover damages therefor. That relief, if appropriate to remedy a proven violation of the antitrust laws, would cause defendant to end its purported current price squeeze practice but need not interfere with rates already approved by the state and federal commissions. The antitrust and regulatory régimes accommodate and supplement each other in order to prove full protection from anti-competitive practices. Here too the remedies afforded under the two statutes can be meshed. As in *Mt. Hood Stages, supra,* 555 F.2d at 692, no plain repugnancy exists between this federal regulatory statute and the Sherman Act as applied to defendant's conduct, nor is it necessary to exempt that conduct from antitrust restraints to make the regulatory statute

work. In truth, as recognized as long ago as *Consolidated Gas, Electric Light & Power Co. v. Pennsylvania Water & Power Co.,* 194 F.2d 89, 97–99 (4th Cir. 1952), certiorari denied, 343 U.S. 963, 72 S.Ct. 1056, 96 L.Ed. 1360, Part II of the Federal Power Act, which contains Section 205 involved in this case, is not repugnant to the antitrust laws and therefore does not supersede them.

In the court below, defendant in effect recognized that the Commission cannot afford the requested relief to plaintiffs because defendant stated it was

"aware of the Commission's inability to remedy a claim of anti-competitive behavior, premised on the difference in rates charged by [defendant] I & M to its wholesale and retail customers, by raising the retail rates to the level of the wholesale rates" (mem. op. 9).

Nor does *Conway* guarantee that the price squeeze may be fully remedied by severely depressing wholesale rates to eliminate the price squeeze. This is because, as we have demonstrated above, the Federal Power Commission cannot set wholesale rates below the lower boundary of the zone of reasonableness even if the price squeeze could not be eliminated without setting the wholesale price below the zone of reasonableness limit. Primary jurisdiction is not a doctrine that requires an exercise in futility. See *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 686, 85 S.Ct. 1596, 14 L.Ed.2d 640. Thus antitrust relief is needed for full protection from the anti-competitive conduct alleged in the complaint.

If plaintiffs prove their case, instead of interfering with any rates approved by the Federal Power Commission, in addition to possible damages, the district court would presumably order defendant to file a new wholesale rate application that would remove the disparity between the rates charged plaintiffs and defendant's industrial customers. The court would thus not be affording a remedy that would "starkly conflict with the explicit statutory mandate of the Federal Power Commission * * *

[or] improperly preemp[t] the jurisdiction of the Federal Power Commission * * *." *Otter Tail Power Co., supra,* 410 U.S. at 395, 93 S.Ct. at 1038 (concurring and dissenting opinion of Justice Stewart). As shown from the opinion below and from the opinion in *Shakopee, supra,* the district court intends to apply the antitrust laws "to the public utility industry only to the extent that the antitrust claims asserted are not within the reach of the regulatory agency's supervision," the very standard recommended by defendant (Br. 21). Under *Otter Tail Power Co., supra,* and *Gulf States Utilities Co., supra,* in fashioning any relief that may be warranted under the Sherman Act, the judiciary must be careful to avoid or resolve any inconsistency with Section 205 of the Federal Power Act. We are confident that the district court will observe this stricture.

Indeed the opinions of the district courts in this case and in *Shakopee* show that they do not intend to interfere with the Federal Power Commission's jurisdiction, because if the Commission should find the respective defendant's higher wholesale rates to be just, the courts would, on proof of violations of Section 2 of the Sherman Act, order the defendants to initiate new rate structures eliminating the dual price system of higher wholesale prices. If the Commission should find the present wholesale rates to be unjust, then the courts would only enjoin the defendants from future dual systems violative of the Sherman Act. Both district courts noted too that it would not disrupt the regulatory process to award damages for any past anti-competitive conduct proved at trial. Therefore, a stay is unnecessary to avoid a clash between the antitrust laws and the Federal Power Act.

### B. *Agency Expertise*

Nor is a stay warranted on the grounds that the Federal Power Commission's expertise will materially advance the district court's fact-finding capacity or aid the district court's determination of the extent of any possible antitrust immunity.

As *amici curiae* "Illinois Municipals." [9] have stated, *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525, has no bearing here because the district court does not need to know the Commission's expert views on what constitutes a just and reasonable rate "as a prerequisite to a determination of whether defendants' activities violate the antitrust laws" (Br. 24). Also, the *Ricci* Court thought the Commodity Exchange Act probably limited the applicability of the antitrust laws there (409 U.S. at 302–304, 93 S.Ct. 573) whereas no such limitation exists here. *Cantor, supra; Otter Tail Power Co., supra.* Under the facts of the instant case, where the district court has first asserted jurisdiction over the antitrust proceedings, it may continue its probe. *California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54; *Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co.,* 184 F.2d 552, 562–566 (4th Cir. 1950), certiorari denied, 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655.

### III. *Discretionary Stay*

Assuming that a discretionary stay could be appropriate even when primary jurisdiction is not in the Federal Power Commission, the district court certainly did not abuse its discretion here. Indeed, the equities weigh heavily in favor of the plaintiff municipalities. The Illinois Municipals point out that the district court should be permitted to proceed in order to avoid the typical lengthy delays that occur in processing wholesale rate increases under Section 205 of the Federal Power Act (16 U.S.C. § 824d). Under that provision, a public utility files its rate increase application no less than 30 days before the effective date thereof, and the Commission typically suspends the proposed rate from one day to five months, with refunds required if the rate is found to be above the statutory "just and reasonable" standard. The wholesale rate increase in the present case stems from a June 13, 1972, application by defendant, and the case was not terminated in the Commission until it approved a settlement on June 1, 1977, a span of five years. Ex-

---

**9.** Cities of Batavia, Geneva, Naperville, Rock Falls and St. Charles, Illinois.

cept for the settlement, the case would still pend before the Commission.

Thus far, the Commission has never rejected a rate filing on price squeeze or other antitrust grounds, and there is no limit on the number of filed increases that may be in effect at the same time under Section 205. Simply by filing an anti-competitive increase and waiting for time to pass, a public utility like defendant can place a price squeeze on wholesale customers. As the Commission has stated, "electric utilities are permitted to file virtually any level of costs and rates and after a period of suspension charge those rates subject to refund, pending Commission decision." FPC Order No. 487, 50 FPC at 127 (1973).

Under this procedure, the price squeeze can continue between the time the Commission allows the rates to go into effect and its final order, for the new *Conway* remedy as to price squeezes does not become effective until then. Thus if a stay were granted to defendant, plaintiffs and customers in similar positions would be unable to secure any relief from price squeezes like this until the Commission finally approved the filed rates. As the Illinois Municipals have picturesquely put it:

"Delay, combined with the multiple rate increases, could mean that the customer has been put out of business by his supplier-competitor. You cannot give refunds to a corpse." (Br. 27–28.)

Furthermore, the Commission would be unable to afford complete relief because the Federal Power Act does not provide for damages or for an injunction against a utility violating the antitrust laws. Thus a stay in this case would excuse defendant's alleged non-compliance with the antitrust laws for a completely unnecessary length of time.

### IV. *Disposition*

At oral argument, we were advised that on January 14, 1977, defendant requested the Federal Power Commission to approve a negotiated settlement between it, these plaintiffs and others for the period from January 13, 1973, to July 27, 1976, when defendant's new wholesale rate schedule became effective. This settlement was ap-

proved on June 1, 1977. See note 3 *supra*. Upon remand, the district court will have to determine whether this settlement agreement has mooted any of the antitrust claims in this case. Of course, the claims stemming from the July 27, 1976, higher wholesale prices are still active.

While we are holding that the district court need not stay further proceedings herein, we agree with Judge Grant that if the district court should ever find it necessary to ascertain particular Commission action in order to decide the exact scope of antitrust damages, or for other purposes, the court may then stay its hand for the purpose of awaiting the Commission result (mem. op. 19).

The orders of May 1, 1975, and October. 22, 1976, are affirmed.