**CITY OF MISHAWAKA, INDIANA, City of Niles, Michigan, City of Columbia City, Indiana, City of Bluffton, Indiana, City of Garrett, Indiana, City of Gas City, Indiana, Town of Frankton, Indiana, Town of Warren, Indiana, Town of New Carlisle, Indiana and Town of Avilla, Indiana, Municipal Corporations, Plaintiffs,**

v.

**AMERICAN ELECTRIC POWER COMPANY, INC., American Electric Power Service Corporation, and Indiana & Michigan Electric Company, Corporations, Defendants.**

**Nos. S 74–72, S 75–210 and S 77–209.**

United States District Court,
N. D. Indiana,
South Bend Division.

Jan. 30, 1979.

Thomas Ewald, Washington, D. C., James J. Olson, Mishawaka, Ind., Theodore L. Bendall, Huntington, Ind., Edward A. Chapleau, South Bend, Ind., Gerald M. Stern and David R. Boyd, Washington, D. C., James R. Fleck, Columbia City, Ind., John M. Rigby, Niles, Mich., for plaintiffs.

Thomas W. Yoder, Fort Wayne, Ind., Peter J. Schlesinger, Dennis G. Jacobs, Lawrence A. Levy, Kenneth R. Logan, Blair C. Fensterstock, and Kathleen Schaaf, New York City, for defendants.

## MEMORANDUM OPINION

ALLEN SHARP, District Judge.

This will state the legal basis for the separately entered findings of fact and conclusions of law.

Plaintiffs are ten municipalities that operate their own electric utilities pursuant to State statutory authority. Each is located within the service area of defendant Indiana & Michigan Electric Company and each purchases its bulk electric power requirements from I & M. The evidence shows that I & M has a monopoly of retail sales of electric power within its service area, and

that the company also controls the supply of electric power to all of the plaintiff municipalities while competing against their municipal electrical utilities for the right to serve all consumers within their corporate limits. I & M and the plaintiffs also compete for the right to serve individual customers located in or near each town or who might choose to locate either in the town or elsewhere in I & M's area.

The rates the plaintiffs pay I & M for electric service are the wholesale rates unilaterally set by the defendants in I & M's filings before the Federal Energy Regulatory Commission. Under the Federal Power Act, as interpreted by the Supreme Court and the Federal Energy Regulatory Commission, in filing new wholesale rates, I & M must compare those rates against its retail rates, consider their possible anticompetitive impact, and not require any of the plaintiffs to pay more at wholesale than it would pay under I & M's retail rates then in effect without justifying the higher wholesale rates. Defendants have ignored this obligation. Since July 1976, defendants I & M and American Electric Power Service Corporation have unilaterally and without justification filed new wholesale rates that have required the plaintiff municipalities to pay over $4 million more than they would have paid under I & M's retail rates then in effect. The evidence shows that the defendants made no attempt to compare their wholesale and retail rates, much less to consider the possible anticompetitive impact of that relationship and try to avoid or at least justify these anticompetitive consequences. All three defendants—I & M, the Service Corporation, and their parent, American Electric Power Company, Inc.—have cast doubt on the continuity of plaintiffs' future supply of electric power by attempting to withdraw from the wholesale market and by seeking to impose time limits on I & M's obligation to serve plaintiffs and restrictions on the quantity of power they may purchase at current rates. Defendants I & M and Service Corporation also have filed and I & M has charged unjust and unreasonable rates which required the plaintiffs to pay over $1,600,000

in excess of reasonable rates for the period 1973–1976 and required the Cities of Niles and Columbia City to pay a total of over $285,000 more than they would have paid under I & M's retail rates in effect during that same period. These practices are designed to promote defendants' policy of taking over utilities operated by municipalities.

Plaintiffs' consolidated complaint seeks relief from defendants' monopolization of the sale of retail electric power within I & M's service area and in each of the plaintiff municipalities, in violation of Section 2 of the Sherman Act. The evidence clearly shows that I & M has monopoly power, and that the defendants' anticompetitive acts tend to exclude the plaintiff municipalities from the electric utility business. Damages and injunctive relief are necessary and appropriate.

In order to establish a violation of the monopolization provision of Section 2, plaintiffs must demonstrate "the existence of monopoly power, whether lawfully or unlawfully acquired, and the general intent to abuse that power." *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 709 (7th Cir. 1977), cert. den. —— U.S. ——, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (Citations omitted). "A specific intent to monopolize need not be shown to establish the offense of monopolization when the monopolist undertakes anticompetitive actions." *Id.* at 711 (Citations omitted). Nor is it necessary to establish that these anticompetitive actions are "predatory" in nature.

In order to recover damages under Section 4 of the Clayton Act, the antitrust plaintiff must demonstrate that he has been injured in his business or property. Id. at 709; see 15 U.S.C. § 15. To obtain an injunction under Section 16 of the Clayton Act, however, the plaintiff need only demonstrate "threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . ." 15 U.S.C. § 26.

## I.

■ The Court's initial determination of the issue of monopoly power controls the standards to be applied thereafter. Where monopoly power is found to exist, a defendant's conduct is assessed in accordance with the monopolization provision of Section 2. If monopoly power is not proved, a plaintiff must satisfy the more rigorous proof requirements of the attempt to monopolize provision of Section 2.

The record demonstrates that defendants possess monopoly power in two respects. First, through defendant I & M, they presently have a monopoly of the retail sales of electricity in the geographic market occupied by I & M. I & M's only competition in that market comes from the plaintiffs and I & M's other wholesale customers. Second, defendants also have a monopoly of the supply of electric power and energy on which the plaintiffs depend to serve their customers and to compete with I & M for retail sales. Establishment of either monopoly brings the monopolization provision of Section 2 into operation.

It is clear that the relevant product market is electric power and energy. There is no substitute for electric power which might be acceptable to industrial, commercial, and residential consumers in Northern Indiana and Southwestern Michigan. Defendants have offered no evidence suggesting that sufficient interchangeability exists between electricity and other forms of power and energy even to give rise to an issue on this point.

Assessment of defendants' monopoly in retail sale of electric power and energy involves definition of the geographic market. In determining the relevant market, the Court must "delineate markets which conform to areas of effective competition and to the realities of competitive practice." *Sargent-Welch, supra,* 567 F.2d at 710, quoting *L. G. Balfour Co. v. F. T. C.,* 442 F.2d 1, 11 (7th Cir. 1971). Applying this practical approach to the geographic market in this case is relatively simple. As one very distinguished commentator has observed:

"The geographic location of the market is usually determined by an examination of the areas in which the particular firm actually competes or operates. If it concentrates its sales and service in one area, this area will normally be the relevant market." E. Kintner *An Antitrust Primer, A Guide To Antitrust And Trade Regulation Laws For Businessmen,* pp. 102–103 (2d Ed. 1973).

Here, defendant I & M has a clearly defined service area in Indiana and Michigan within which it sells electric power and energy at retail pursuant to franchises granted by the municipalities and townships. I & M has tariffs on file for those areas in the Public Service Commissions of Indiana and Michigan, pursuant to which it offers to sell electricity at retail to all interested buyers. Moreover, as the defendants have stated, no other public utility is allowed to sell electric energy at retail within this area.

Using the method for identifying the nature and control of the relevant market approved and relied on by the Supreme Court of the United States in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 370, 93 S.Ct. 1022, 1026, 35 L.Ed.2d 359 (1973), the evidence indicated that I & M serves 89% of the municipalities and townships located within its service area directly at retail. The remaining 11% are served at retail by the plaintiffs and by other municipal wholesale customers of I & M. Defendants' share of the relevant market in this case is comparable to the 91% share found to constitute a monopoly by the Supreme Court of the United States in *Otter Tail, id.,* and is substantially greater than the 75.6% that the District Court in *Otter Tail* deemed sufficient to support a conclusion of monopoly power. *United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 59 (D.Minn. 1971), aff'd 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

Defendants' monopoly of retail sales within the geographic market is equally clear when measured in terms of the amount of electric power and energy sold there. The evidence shows that I & M

made 85% of all the retail sales made by public utilities and municipalities in the relevant geographic market in the year 1977, and 80% of all retail sales if the retail sales of the seven rural electric cooperatives that purchase all of their power at wholesale are included.

By either standard, I & M possesses a monopoly in the retail sales of electric power within the geographic market in which it operates. These percentages are comparable to the 90% figure found to constitute a monopoly in *Sargent-Welch, supra,* 567 F.2d at 709, in addition to being far in excess of that found sufficient to give rise to a finding of monopoly power by the *Otter Tail* District Court. Other courts likewise have found monopoly power based on marker concentrations of a comparable or smaller nature. See, *e. g., United States v. Grinnell Corp.,* 384 U.S. 570, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (Defendant's control of 87% of the accredited central station service business "leaves no doubt that the congeries of these defendants have monopoly power").

The evidence shows that each of the plaintiffs depends on I & M for between 95% to 100% of its bulk power supply of electric power and energy for its own use and for resale to its customers. Though the law imposes no obligation on the plaintiffs to build new generation facilities, to go into the business of generating electric power, or to build new transmission lines to other utility companies in an effort to resist defendants' monopolization, the evidence shows that plaintiffs cannot become independent of I & M within any reasonable time by any of those methods. Demonstration of the defendants' complete monopoly of plaintiffs' source of supply is—standing alone—sufficient to require the invocation of the monopolization standards of Section 2.

The fact that the electric utility industry is a "highly regulated industry critical to the Nation's welfare makes the play of competition not less important but more so." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 372, 83 S.Ct. 1715, 1746, 10 L.Ed.2d 915 (1963). The plaintiffs compete with I & M in a number of ways.

Plaintiffs and I & M compete for retail sales in the relevant geographic market. Because no other public utility can engage in retail sales of electricity within I & M's franchised service area, the plaintiffs and I & M's other wholesale customers offer the only source of effective competition for retail sales within this market.

I & M also is in competition with each of the plaintiffs for all the customers presently served by the plaintiffs' municipal utilities. The decision by the voters of any of the plaintiffs to discontinue operating their municipal utility inevitably will result in I & M's serving all those customers directly at retail. That has been the experience of the municipalities that have sold their utilities to I & M since 1957. And, as Theodore Stichler testified, the uniform pattern in Indiana indicates that the public utility serving the community at wholesale expands into that retail market when the municipality decides to discontinue its electric utility. I & M, the only source of power to the plaintiff municipalities, has retail tariffs on file that encompass the plaintiffs' territories.

Since 1957, I & M has purchased or leased the facilities of five municipalities it formerly served at wholesale. As a result, the customers previously served by those municipal utilities became direct retail customers of I & M immediately thereafter, and they remain I & M's customers today. Defendants have had, and currently have, a policy of acquiring municipal utilities where possible and they presently are considering the purchase of the municipal utility of the Town of Avilla, a plaintiff in this case.

The evidence shows that plaintiffs and I & M compete for customers of the municipal utilities in the same manner as that found by the Supreme Court of the United States in *Otter Tail, supra.*

As the court there found:

"In towns where Otter Tail distributes at retail, it operates under municipally granted franchises which are limited

from 10 to 20 years. Each town in Otter Tail's service area generally can accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail. The aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail. That competition is generally for the right to serve the entire retail market within the composite limits of a town, and that competition is generally between Otter Tail and a prospective or existing municipal system. These towns number 510 and of those Otter Tail serves 91%, or 465." 410 U.S. at 369–370, 93 S.Ct. at 1025–1026.

This same kind of competition also was recognized and protected by the United States Court of Appeals for the District of Columbia in *Conway Corporation v. Federal Power Commission*, 167 U.S.App.D.C. 43, 510 F.2d 1264, 1268–1268 (1975), aff'd, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). See also Meeks, *Concentration in the Electric Power Industry: The Impact of Antitrust Policy*, 72 Colum.L.Rev. 64 (1972) and Hearings on S. 218 Before the Senate Comm. on Commerce, 89th Cong., 1st Sess., ser. 89–38, at 68 (1965), both of which are quoted in *Conway, supra*, 510 F.2d at 1268, and at 1268, n. 11.

Actual and potential competition also exists between plaintiffs and I & M for certain customers presently located in some of the plaintiff municipalities. As the evidence shows, I & M serves nine large industrial customers at retail in the Cities of Mishawaka, Gas City and Niles, selling retail electric power to those customers at rates lower than its wholesale rates to the plaintiffs. Potential competition for those customers exists, and the relationship between I & M's wholesale and retail rates is the major factor governing that competition. The evidence also indicates that I & M has competed for other industrial and residential customers presently served at retail by plaintiff Niles, Michigan.

Each of the plaintiffs is also in competition with I & M for customers in areas adjacent to their municipal boundaries. In some cases, both I & M and the municipalities offer electric services to those customers. Each of the Indiana plaintiffs also is in competition for those customers in that each is authorized to annex those areas, and thus to displace I & M as the electric utility that serves their customers at retail. The evidence shows that the Indiana plaintiffs have used their power of annexation to expand their boundaries, and consequently to expand their own retail market. These annexations by the plaintiffs result in their purchase of I & M's distribution lines and facilities in that area and their takeover of I & M's retail customers.[1]

## II.

The evidence in this case shows that, through I & M, the defendants have a monopoly of the retail sales of electric power within I & M's service area, and that they have a complete monopoly of plaintiffs' power supply. At issue in this case is the manner in which defendants have used the

---

1. At the time of oral argument the defendants cited and provided to this Court a full copy of the unpublished opinion in *SCM Corporation v. Xerox Corporation*, 463 F.Supp. 983 (D.Conn., No. 15,807, December 29, 1978, Newman, J.), a massive opinion in a massive case. Judge Newman has literally written a treatise in a wide ranging area of antitrust and patent law and the interrelationship between the two. The defendants appear to cite this case to demonstrate an analogy between the public grant of patent rights there and the public authorization of utility rates here. It is also cited for its relevant market discussion. The discussion of Section 2 of the Sherman Act commences at page 1006 of the opinion in unpublished form and concludes on page 1015. At page 1011 Judge Newman states:

"With respect to assets other than patents, there is authority that a monopolist's unilateral refusal to deal violates the antitrust laws where the refusal is a part of an attempt to further monopoly power. *E. g., Lorain Journal Co. v. United States* [342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162], supra; *Otter Tail Power Co. v. United States* [410 U.S. 336, 93 S.Ct. 1022, 35 L.Ed.2d 359], supra."

The reasoning in SCM considered in its own factual setting, does not compel a result contrary to the one here announced.

leverage afforded by this total monopoly over plaintiffs' power supply to preserve and expand their monopoly of retail sales in I & M's service area. The evidence shows that defendants have engaged in anticompetitive and exclusionary acts and practices having the purpose and effect of preserving and expanding I & M's existing monopoly in retail sales of electric power.

Beginning in 1972, defendants have forced the plaintiffs to purchase wholesale electric power pursuant to unregulated rates that are unjust and unreasonable and that, for substantial periods of time, have required the plaintiffs to pay more for their wholesale electric power than they would have paid if they had purchased the same electric power at retail. Under the Federal Power Act, defendants can put I & M's wholesale rates into effect simply by filing a tariff. Thereafter, those rates remain in effect at the level set by defendants until the Federal Commission has adjudicated their justness and reasonableness or until they are superseded by new rates. By filing higher superseding wholesale rates before the Commission has adjudicated I & M's former tariffs, defendants have, since 1972, served plaintiffs pursuant to unregulated rates that have never been approved at the levels filed and charged by I & M.

Not only have defendants patterned I & M's rate filings in a manner that effectively abrogates the protections that plaintiffs might expect from the Federal Commission, they themselves have ignored their own obligations under the Federal Power Act. The Act requires that public utilities charge only rates that are "just and reasonable" and specifically declares that any nonconforming rates are unlawful. 16 U.S.C. § 824d(a). Not once during the entire period at issue have defendants charged a wholesale rate that the Commission has determined to be just and reasonable; on each occasion when a Commission Administrative Law Judge has examined I & M's wholesale rates, he has concluded that they were excessive, unjust and unreasonable, and has ordered them lowered.

The Federal Power Act also requires defendants to compare I & M's wholesale rates against its retail rates, consider their possible anticompetitive impact, and not require any of the plaintiffs to pay more at wholesale than it would under I & M's retail rates in effect without justifying the higher wholesale rates. Defendants have ignored this obligation as well. As the evidence clearly indicates, the defendants made no attempt to compare their wholesale and retail rates, much less to consider the possible anticompetitive impact of that relationship and try to avoid the anticompetitive consequences or, at a minimum, justify any anticompetitive consequences that the defendants claim cannot be avoided.

I & M's anticompetitive wholesale rates have been imposed on the plaintiffs in disregard of these statutory obligations. From July 27, 1976 to August 31, 1978, defendants required the plaintiff municipalities to pay over $4 million more at wholesale than they would have paid under I & M's retail rates then in effect. Defendants filed these excessive and discriminatory wholesale rates without giving proper consideration to their relationship to I & M's retail rates or to the anticompetitive impact of that rate relationship. At no time while these rates were in effect did the defendants make a proper effort to justify the substantial disparity between I & M's wholesale and retail rates, either to the Federal Energy Regulatory Commission or to this court.

Defendants' anticompetitive rate practices have been compounded by a number of other exclusionary acts. All three of the defendants made serious and repeated statements that they desire to withdraw from the wholesale market and that, in the event of power shortages, the plaintiffs' power supply will be curtailed first while I & M continues to serve its retail customers. Similarly, defendants sought to impose a "day-to-day service limitation in its contract with the City of Mishawaka, to limit its contract to three years, and to impose discriminatory restrictions on the quantity of power that Mishawaka could purchase at

current rates. Even after that contract was held to be unjust, unreasonable and discriminatory by an FERC Administrative Law Judge, I & M offered similar contracts to the other plaintiffs.

Each of the defendants' anticompetitive acts is exclusionary and impairs the plaintiffs' ability to continue to operate their municipal utilities and to continue to compete with I & M. I & M's unjust and unreasonable wholesale rates, and in particular I & M's imposition of wholesale rates that are in excess of its comparable retail rates, impair each plaintiff's ability to offer competitive rates and service to present and potential customers and to offer its citizens the ·full range of benefits they otherwise would obtain from the ownership and operation of their municipal utility. Defendants' deliberate statements threatening plaintiffs' power supply cast doubt on the plaintiffs' ability to offer adequate service to existing and potential customers. All of defendants' repeated anticompetitive practices together have left plaintiffs with no choice but to engage in constant time-consuming and costly litigation, thus diverting the resources that should be committed to the operation of their municipal utilities and to the provision of the benefits of those operations to attempting to secure just and equitable treatment in accordance with the antitrust laws and the Federal Power Act.

The history of plaintiffs' experience before the Federal Commission demonstrates that the relief it can offer invariably comes too little and too late. Commission-ordered refunds take years to obtain, and even then are only obtained as the result of expensive and unreimbursed administrative litigation. As the Court of Appeals recognized, these refunds do not provide an antitrust damage remedy, *City of Mishawaka, Indiana v. Indiana & Michigan Electric Co.,* 560 F.2d 1314, 1325 (7th Cir. 1977), *cert. denied,* 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978), and the belated refunds do nothing to remedy or mitigate the anticompetitive impact of I & M's excessive and discriminatory rates that plaintiffs suffer during the considerable periods of time that they are in effect. Finally, although the Power Act

places the primary obligation on the defendants to charge only just and reasonable rates and to consider and avoid anticompetitive discriminations between I & M's wholesale and retail rates, the Power Act does not authorize the FERC to issue an injunction mandating future compliance. Each successive violation of the Act must be considered by the Commission individually in lengthy and costly administrative adjudication. Each Commission remedy comes long after the fact, and always after the defendants have superseded one illegal wholesale rate with another, higher illegal rate.

In August of 1977, the Court of Appeals for the Seventh Circuit made the following observation:

> "Thus far, the Commission has never rejected rate filing on price squeeze or other antitrust grounds, and there is no limit on the number of filed increases that may be in effect at the same time under Section 205. Simply by filing an anti-competitive increase and waiting for time to pass, a public utility like defendant can place a price squeeze on wholesale customers." 560 F.2d 1325.

The comprehensive opinion of Judge Cummings, joined by Judges Tone and Bauer is not only persuasive authority but it represents a significant part of the law of this case.

Defendants' anticompetitive practices continue to impair plaintiffs' ability to serve their citizens and customers and to weaken their ability and resolve to continue operating their municipal utilities and compete with I & M.

■ As the Seventh Circuit recognized in *Sargent-Welch, supra,* 567 F.2d at 710–711, the monopolization provision of Section 2 does not require that the defendant have acted with specific intent to monopolize; general intent is sufficient. General intent is simply "an intent to bring about the forbidden act," *United States v. Aluminum Co. of America,* 148 F.2d 416, 432 (2d Cir. 1945); *i. e.,* the act that has the forbidden consequence. The specific intention to achieve that forbidden consequence need

not be proved. "It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements." *United States v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948). "A business organization which has acquired monopoly power is guilty of monopolization if it undertakes a course of action the consequence of which would be to exclude competitors or prevent competition." *American Football League v. National Football League,* 205 F.Supp. 60, 64 (D.Md.1962), *aff'd,* 323 F.2d 124 (4th Cir. 1963).

The Supreme Court recognized in *Griffith, supra,* that "[t]he anti-trust laws are as much violated by the prevention of competition as by its destruction," 334 U.S. 107, 68 S.Ct. at 945, citing *United States v. Aluminum Co. of America, supra.* Accordingly, "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *Id.* See also *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029 (1973). Subsequently, in *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704 (1966), the Court explained,

"The offense of monopoly . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

■ As *Griffith* indicates, a monopolist's original acquisition of monopoly power by legitimate means is no defense to a charge that he has sought to maintain or extend that position by prohibited means. This is illustrated by *Otter Tail,* where the District Court noted that the plaintiff raised no challenge to the manner in which the defendant had obtained its monopoly. *United States v. Otter Tail Co., supra,* 331 F.Supp. at 58. Concluding that defendant possessed monopoly power, however, the District Court regarded the question then to be "whether Otter Tail has sought to *maintain*

that power." Id. at 59. (Emphasis in original.)

■ One possessing monopoly power need not be found to have engaged in predatory conduct in order to have engaged in prohibited monopolization. Frequently the offense of monopolization is based on the conclusion that the defendant has engaged in "exclusionary conduct"—conduct that does not further competition on the merits or that tends to impair the opportunities on the merits or that tends to impair the opportunities of his rivals to compete. Thus, as the Seventh Circuit stated in *Sargent-Welch, supra,* 567 F.2d at 711–712:

"There are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anti-competitive tendency, are unlawful under § 2 if done by a monopolist, *e. g.,* the leasing practices *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 343 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); see also 1 von Kalinowski § 8.02[4][b], p. 8–55."

See also E. Kintner, *An Antitrust Primer, A Guide To Antitrust Law And Trade Regulation Laws For Businessmen,* p. 106 (2d Ed. 1973). Defendants have repeatedly contended that plaintiffs cannot prevail unless they establish that the challenged acts and practices are "predatory" in nature. Indeed, they even have suggested that the Seventh Circuit's opinion in *Sargent-Welch* supports that proposition. Although *Sargent-Welch* nowhere mentions "predatory acts," the defendants' "edited" quotation from that opinion is advanced in a manner that seems to suggest that such a finding is essential to recovery. The authorities discussed above demonstrate the error of defendants' position. Moreover, it is significant to note that the Seventh Circuit supported its conclusion that a monopolist cannot engage in conduct that might be permissible for a non-monopolist by citing the *United Shoe* opinion—a case that found a violation of Section 2 on the basis of con-

duct that it specifically found was not predatory. Certainly the Seventh Circuit's explicit reliance on *United Shoe* belies defendants' attempt to advance *Sargent-Welch* in support of their argument that predatory acts are an essential prerequisite to a finding of liability under Section 2 of the Sherman Act. A monopolist's exclusion of its competitors from a source resource or facility is particularly condemned by the antitrust laws. *United States v. Otter Tail, supra,* 331 F.Supp. at 61.

Perhaps the best-known judicial finding of illegal monopolization in the absence of evidence of predatory acts is the *Alcoa* case. *United States v. Aluminum Company of America, supra.* There the defendant had not engaged in predatory, unfair or forbidden practices. Its monopoly position instead resulted from the practice of entering each new field as the opportunity presented itself, and thus expanding to meet and satisfy the market demand for aluminum. Judge Learned Hand found that this conscious expansion constituted monopolization:

> "It was not inevitable that [Alcoa] should always anticipate increases in the demand for ingot and be prepared to supply them. Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no· more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel." *Id.* 148 F.2d 431.

The classic opinion in *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295 (D.Mass.1953), *aff'd per curiam* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), likewise found a violation of Section 2 on the basis of practices that the court specifically acknowledged were not "predatory, immoral, nor, on their fact, discriminatory as between different customers." *Id.* at 297. There the primary evil was the defendant's practice of leasing shoe manufacturing machinery rather than offering it for sale. This and other practices were acknowledged to be natural and normal practices that were, to quote Judge Learned Hand, "honestly industrial." *Id.,* at 344, quoting *Alcoa, supra,* 148 F.2d at 431. And although the non-monopolist could freely engage in those same practices, the monopolist could not. See also, *Greyhound Computer Corp. v. IBM,* 559 F.2d 488 (9th Cir. 1977), cert. den. 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). For a current and careful analysis of this area see *U. S. v. CBS, Inc.,* 459 F.Supp. 832 (C.D.Cal.1978).

The antitrust laws are particularly hostile to the use of monopoly power in one market to restrict competition in another. For example, in *United States v. Griffith, supra,* the Supreme Court of the United States concluded that the defendant's use of the leverage it possessed from its monopoly of movie theatres in some towns to enhance its bidding position in non-monopoly towns constituted a violation of Section 2. Similarly, in the recent opinion of *Berkey Photo, Inc. v. Eastman Kodak Co.,* 74 F.R.D. 613 (S.D.N.Y.1977), Judge Frankel regarded the judicial decisions proscribing tie-ins as per se violations of the antitrust laws to be "cognate authority" for the resolution of charges that defendant Kodak had used the leverage it enjoyed from its monopoly position in one market to gain competitive advantage in another. *Id.,* 457 F.Supp. at 413. Concluding that Kodak's use of its market position in the second market was not "economically inevitable," *id.* at 414, *citing United States v. United Shoe Machinery Corp.,* 110 F.Supp. at 345, and was "plainly avoidable," *id.,* the court in *Berkey* found these practices to be in violation of Section 2.

Relying on *Sargent-Welch Scientific Co., supra,* the *Berkey* court rejected defendants' protest that it was being punished for conduct that other firms, lacking monopoly power, regularly engaged in with impunity. As Judge Frankel observed, "[T]he short answer is that the antitrust laws do not permit the willful maintenance

of monopoly power by conduct that might for a company without such power be deemed 'honestly industrial.'" *Berkey Photo, Inc., supra,* 457 F.Supp. at 414, quoting *United States v. Aluminum Co. of America, supra,* 148 F.2d at 431. A monopolist's practices are subjected to much more rigorous scrutiny.

■ Obviously, one possessing monopoly power must take care to avoid abuse of that power by refraining from engaging in activities having a "tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency." *Sargent-Welch, supra,* 567 F.2d at 711–712. Under the applicable antitrust standards, this court must determine whether defendants' behavior represents simply the employment of processes and techniques "which a competitive society must foster," *United Shoe, supra,* 110 F.Supp. at 344, or whether a preponderance of the evidence indicates that defendants have proceeded by "arrangements, and policies which, instead of encouraging competition based on pure merit, further[ed] the dominance of a particular firm." *Id.,* at 344–345; see also *Berkey, supra,* 457 F.Supp. at 412.

■ The evidence in this case shows that defendants have used their control over plaintiffs' power supply to protect and further I & M's dominance of the electric power business in its area. The defendants' practices of requiring the plaintiffs to pay unjust, unreasonable and discriminatory rates for electric power, attempting to withdraw from the wholesale market, attempting discriminatorily to limit I & M's obligation to serve its municipal customers to short terms and restricted quantities, all have impaired the plaintiffs' ability to compete. This is the same kind of use of monopoly power in one market to stifle competition in another that was condemned by the Supreme Court of the United States in

*Griffith* and more recently by the District Court in *Berkey.* Defendants' conduct is in violation of Section 2 of the Sherman Act.

One central issue in judicial decisions frequently has been whether the challenged exclusionary conduct was "inevitable," or whether it might have been avoided had the monopolist chosen to do so. *United States v. Aluminum Co. of America, supra,* 148 F.2d at 431; *Berkey, supra,* 457 F.Supp. at 414; *United Shoe, supra,* 110 F.Supp. at 345. This consideration also was emphasized by the Seventh Circuit in this very case, *City of Mishawaka v. Indiana & Michigan Electric Co., supra,* 560 F.2d at 1320, and in the opinion of *City of Shakopee v. Northern States Power Co.,* Civ.No.4–75–591 (D.Minn.1976) on which the Seventh Circuit relied. (although unpublished, this court has carefully examined the full order in *Shakopee.*) [2]

■ The antitrust laws require that a monopolist avoid exclusionary conduct that is not inevitable. In this case, that general antitrust obligation is complemented by a similar duty arising from Section 205(b) of the Federal Power Act, which prohibits undue discrimination between wholesale rates and state-regulated retail rates.

Section 205(b) of the Federal Power Act specifically prohibits public utilities from "subject[ing] any person to any undue prejudice or disadvantage" or "maintain[ing] any unreasonable difference in rates", *16 U.S.C. § 824d(b).* In *Conway Corporation v. Federal Power Commission,* 167 U.S.App. D.C. 43, 510 F.2d 1264 (1975), *aff'd,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the Court of Appeals for the District of Columbia Circuit held that the Federal Power Commission had jurisdiction to consider the possible anticompetitive effects of the relationship between wholesale and retail rates, and that the Commission must consider such allegations that are presented to it.

---

**2.** In the recent case of *City of Newark et al. v. Delmarva Power & Light Co.,* —— F.Supp. —— (No. 77254, D.Del. Jan. 8, 1979, Stapleton, J.), there appears to be nothing in it that compels a result different than that announced here. The posture of the record here is in a much later procedural stage. To the extent that Judge Stapleton puts a slightly different shade on *City of Mishawaka et al. v. Indiana & Michigan Electric Company,* 560 F.2d 1314 (7th Cir. 1977), this Court is bound by its holding as a part of the law in this case.

The Court's ruling was based on its determination that the prohibition against discrimination in Section 205 of the Federal Power Act prohibits discrimination between wholesale and retail rates. *Id.* at 1270–1272. The Supreme Court's affirmance of that decision, *Federal Power Commission v. Conway Corp.,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), likewise was based on its determination that a public utility's obligation to avoid any "unreasonable difference in rates" encompassed a duty to avoid such discrimination between wholesale and retail rates. *Id.* at 277–279, 96 S.Ct. at 2004. The Supreme Court concluded that a public utility does not automatically satisfy this duty simply by charging rates that are "just and reasonable" under Section 205(a) of the Power Act, 16. U.S.C. § 824d(a), and that the Commission can alleviate the anticompetitive effects of the relationship between retail rates and a "just and reasonable" wholesale rate by ordering the utility to charge a lower wholesale rate that falls within the "zone of reasonableness" contemplated by the Act.

Section 205 of the Federal Power Act, as interpreted by the Supreme Court in *Conway,* clearly requires I & M to avoid unreasonable and anticompetitive disparities between its wholesale and retail rates. More recently, in *Missouri Power & Light Company,* FERC Docket No. ER 76–539 (October 27, 1978) [Ex. P–191], the Federal Energy Regulatory Commission held that the absence of "relative parity" between wholesale rates and the actual retail rates in effect and being charged, *id.* at 7, establishes a "price squeeze" under the Federal Power Act, irrespective of the "intent" of the public utility. *Id.* at 9. This, in turn, creates a "presumption that the rates are unduly discriminatory." *Id.* at 10, n. 18. As the Commission noted, the increase in the company's retail rates appeared to eliminate the "price squeeze" in that case prior to the time Missouri Power & Light's prospective rate became effective. *Missouri Power & Light Co.,* FERC Docket No. ER 76–539 (October 27, 1978), at 7. In order to be satisfied of that fact, however, the Commission required the company to file its current industrial rate schedule. *Id.* Thus, clearly the Commission's focus is on *actual* rates, not some illusory proposed retail rate that may never be charged. Together, *Conway* and the Commission's decision in *Missouri Power* establish that defendants must consider and avoid anticompetitive effects caused by the relationship between I & M's wholesale rates and its actual retail rates, then in effect. The evidence reveals that defendants have not here attempted to honor this obligation.

In deposition testimony introduced in evidence in this case, John Howard, Senior Vice President for Rates of the American Electric Power Service Corporation, testified that I & M seeks the highest rates it believes it can justify under the applicable standards, giving no consideration to the competitive impact of I & M's rates on its municipal wholesale customers. [Howard deposition 1/27/78 at 57] Other depositions of the present and former I & M officials having responsibility for the company's wholesale rate filings in the Federal Commission since the *Conway* decisions confirm that defendants, although aware of *Conway,* have not and do not compare the rate levels between I & M's wholesale and retail customers, and that I & M has made no changes whatsoever in its procedures following *Conway* for the purpose of complying with its obligations under the Federal Power Act. [Kopper deposition 10/3/78 at 54; Stark deposition 10/2/78 at 29–34; Tupper deposition at 53]

Defendants' disregard of their statutory obligation to avoid undue discrimination between wholesale and retail rates was further confirmed at trial. Robert M. Kopper, Executive Vice President and chief operating officer of I & M from 1968 to 1976 [Tr. 333], testified that no changes were made in I & M's standards and procedures for the purpose of complying with the requirements of the Federal Power Act, as interpreted in *Conway.* [Tr. 359] Similarly, Jack F. Stark, Mr. Kopper's successor as Executive Vice President of I & M from 1976 to 1978 [Tr. 759], testified at trial that I & M has never had a policy of tailoring

wholesale rates to prevent them from being higher than its retail rates, then in effect [Tr. 765] and that this has not even been a subject of discussion. [Tr. 766] Mr. William A. Black, who became Executive Vice President of I & M in July of 1978 [Black deposition, at 4] and currently serves in that position [Tr. 580], testified that he has not reviewed I & M's present or proposed rates, and that he has taken no action to assure that the rates I & M charges its wholesale customers are not higher than the rates those customers would pay if they were being served at retail. [Tr. 593–594] Nor has Mr. Black had any discussions about the possibility of tailoring I & M's rate applications to provide for competitive wholesale and retail power rates. [Tr. 596]

■ Thus, defendants continue to prepare and file their wholesale rate applications in disregard of their obligation under Section 205 of the Power Act to refrain from undue discrimination between wholesale and retail rates. This violation of their Power Act obligation constitutes a willful disregard of their legal obligations. Defendants' willful refusal to apply the regulatory criteria established by the Federal Power Act is a clear violation of the defendants' duties under that Act and under the antitrust laws as well.

In view of defendants' monopoly power, only a general intent to monopolize must be shown. Even if a "specific intent" were required, however, the evidence is adequate to meet that standard.

In virtually all cases requiring a finding of intent, that intent is inferred from the nature of the acts at issue. More direct proof of intent is the exception rather than the rule.

The Supreme Court of the United States recently recognized this principle in *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), a criminal case brought under Section 1 of the Sherman Act. After carefully reviewing the law of criminal intent, the court stated, 438 U.S. at 444, 98 S.Ct. at 2877:

"Our question . . . is whether a criminal violation of the antitrust laws requires, in addition to proof of anticompetitive effects, a demonstration that the disputed conduct was undertaken with the 'conscious object' of producing such effects or whether it is sufficient that the conduct is shown to have been undertaken with knowledge that the proscribed effects would most likely follow. While the difference between these formulations is a narrow one, see ALI Model Penal Code § 2.02, comment, at 125 (Tent. Draft 4 1955), we conclude that action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws."

See also *id.;* n. 21.

■ If intent can be inferred from conduct in criminal antitrust cases, it obviously can be inferred in civil actions, where the constitutional concerns are of a substantially diminished magnitude. Moreover, in reaching its determination, this court must assess the evidence in its entirety. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *United States v. Empire Gas Corp.,* 537 F.2d 296 (8th Cir. 1976), cert. den. 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

All of defendants acts and practices, taken together, show that they have acted with "specific intent" to impair plaintiffs' competitive ability, and thus to preserve and expand their existing monopoly. The "probable consequence", [*United States v. Gypsum, supra,* 438 U.S. at 444, 98 S.Ct. at 2877] of I & M's dual rate structure is that the imposition of wholesale rates in excess of I & M's comparable retail rates will impair plaintiffs' ability to offer rates and services competitive with I & M's, and thus diminish their ability and resolve to remain in the electric power business in competition with I & M. As *Gypsum* indicates, the evidence need not specifically show that this was defendants' "conscious object" in order to establish that they specifically intended that result.

The specific intent in defendants' statements threatening plaintiffs' power supply is clearer. As Administrative Law Judge Samuel Kanell found, defendants' conduct "inhibits growth within the service area of these wholesale customers and frustrates any effort to encourage new industry or commercial activity to locate within the service area of the complainants." [Ex. p–6, and D–106, Initial Decision, at 14] Judge Kanell concluded that the defendants had not shown that the needs of the electric users served by I & M's wholesale customers were substantially different from I & M's retail customers, *id.* at 15–16, and that defendants actions "created apprehension, uncertainty and potential prejudice with respect to future continuity of service." *Id.* at 16. Finally, as Judge Kanell found:

"The service areas of the municipal utilities are located generally within the area served by AEP and it may be reasonable to conclude that if electric service by AEP to any of these municipal distribution systems were disrupted, AEP would develop arrangements to directly serve the patrons of these local systems in the same manner that AEP has been serving several large industrial firms located within the service areas of some of these municipal systems. If this were to occur, there would be no change in the total power demands on the AEP system." *Id.* at 17.

The Administrative Law Judge concluded that these activities were in violation of defendants' traditional utility obligation to serve all customers on a nondiscriminatory basis, *id.* at 16, and ordered AEP to treat all classes of customers fairly and equitably, and to cease and desist from any actions that single out any class of customers for the purpose of indicating that its continuity of service may be in jeopardy. *Id.* at 20.

The Supreme Court has recognized that the doctrine of *res judicata* applies to factual findings made by administrative agencies acting in their judicial capacity in cases in which the agency resolved disputed factual issues that the parties had an adequate opportunity to litigate. *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). *Res judicata* is particularly appropriate where, as here, the agency's findings reflect its particular expertise in an area committed to it by Congress. Judge Kanell's decision and all of the Initial Decisions in which plaintiffs have successfully challenged defendants' practices have been appealed, however, they are not final. 18 C.F.R. §§ 1.30–1.21. This may deprive Judge Kanell's decision of the formal *res judicata* effect to which it should be entitled. Nevertheless, the considered opinion of an Administrative Law Judge, acting within his area of particular expertise and on the basis of a fully litigated record, is entitled to considerable deference. At a minimum, the facts found by Judge Kanell are *prima facie* evidence of the truth of those matters. These facts are likewise established by independent evidence introduced in this case, and have not been rebutted by evidence offered by defendants.

Judge Kanell's legal conclusion that defendants have violated their traditional public utility obligation to serve all customers within I & M's service area on a fair and equitable basis is clearly supported by the evidence in this case. This court should also conclude that defendants' attempt to withdraw from the wholesale market and their other discriminatory attempts to restrict I & M's duty to serve the plaintiffs violated I & M's common law public utility obligation to offer service to all customers within the service area on an equitable and nondiscriminatory basis.

In *United Gas Co. v. Railroad Comm'n of Ky.,* 278 U.S. 300, 309, 49 S.Ct. 150, 152, 73 L.Ed. 390 (1929), the Supreme Court of the United States stated:

"The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give."

Cf. *Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co.,* 184 F.2d 552, 567 (4th Cir.), *cert. denied,* 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655 (1950).

This same public utility obligation is recognized in the laws of Indiana and Michigan, which require public utilities to provide reasonably adequate service to all at reasonable rates and without undue discrimination. For example, the Indiana statutes define "utilities" to include all plants furnishing "heat, light, water or power, *either directly or indirectly to the public,*" Ind.Code Ann. § 8–1–2–1 (emphasis added), *and specifically require that each such public utility "furnish reasonably adequate service and facilities," id.,* § 8–1–2–4. As the Indiana courts have recognized, that State's law imposes a duty to serve the public without discrimination, *Indiana Natural Gas & Oil Co. v. State ex rel. Armstrong,* 162 Ind. 690, 71 N.E. 133 (1904); *Richmond Natural Gas Co. v. Clawson,* 155 Ind. 659, 58 N.E. 1049 (1900), and the Indiana statutes make undue discrimination by a public utility a misdemeanor. Ind.Code Ann. § 8–1–2–105. Michigan statutes also codify the common law obligations of public utilities, requiring that they offer utility services "to the public generally" on reasonable terms, rates and conditions as determined by the Michigan Public Service Commission. Mich.Stat.Ann. § 22.13(6) [M.C.L.A. 460.6]. The courts of Michigan have likewise held that public utilities operating in Michigan have a duty to serve all patrons without discrimination, *Michigan Public Service Co. v. Maddy,* 284 Mich. 392, 279 N.W. 874 (1938); *Ten Broek v. Miller,* 240 Mich. 667, 216 N.W. 385 (1927).

The Federal Power Act, enacted to fill a constitutional gap in state regulation of electric utilities, *Federal Power Commission v. Southern California Edison Co.,* 376 U.S. 205, 213, 84 S.Ct. 644, 650, 11 L.Ed.2d 638 (1964), placed federal regulation on the same basis as regulation under the previous common law and state statutes. The Act incorporated the common law and state statutory prohibition against discrimination between consumers in Section 205, 16

U.S.C. § 824d(b), which was interpreted by the Supreme Court in *Federal Power Commission v. Conway Corp., supra,* to proscribe discrimination between wholesale and retail rates. Defendants cannot argue that the imposition of federal jurisdiction over I & M's wholesale sales relieved I & M of its common law and statutory obligations to avoid discrimination among I & M's customers. Moreover, federal antitrust law recognizes complementary obligations on persons possessing scarce resources or facilities that are essential to effective competition. As the District Court observed in *United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 61 (D.Minn.1972), aff'd 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973):

"Pertinent to an examination of the law is a reference to cases expressive of the 'bottleneck theory' of antitrust law. This theory reflects in essence that it is an illegal restraint of trade for a party to foreclose others from the use of a scarce facility. Here the theory finds application in Otter Tail's use of its subtransmission lines. One authority believes:

'The Sherman Act requires that where facilities cannot practically be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms.' [3]

[3] A. D. Neale, *The Antitrust Laws of the U. S. A.,* Cambridge University Press at 67 (1960).

"This statement epitomizes the holdings in federal cases which have established the principle: *United States v. Terminal Railroad Assoc.,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.,* 194 F.2d 484 (1st Cir. 1952); *Packaged Programs, Inc. v. Westinghouse Broadcasting Co.,* 255 F.2d 708 (3rd Cir. 1958); *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir. 1966)." *United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 61 (D.Minn.1972) *aff'd,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

Taken together, defendants' actions show that they were undertaken with the specific

intent of impairing the plaintiffs' competitive position and preserving and expanding I & M's monopoly in retail sales of electric power in its service area.

The defendants' practices of requiring the plaintiffs to pay unjust, unreasonable, and discriminatory rates for electric power, their attempt to withdraw from the wholesale market and discriminatorily to limit I & M's obligation to serve its municipal customers to short terms and restricted quantities, which Administrative Law Judges in the Federal Commission repeatedly have found in violation of the Federal Power Act and defendants' public utility obligations, were not "honest industrial" practices or "economically inevitable" events. All were deliberate acts aimed at the plaintiffs, unprovoked, unjustified, and clearly avoidable. Specific intent is present in this case.

### III.

Defendants contend that because I & M's wholesale and retail rates result from filings before the state and federal commissions the First Amendment immunizes their rate practices from antitrust scrutiny. For support, they rely on *Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed. 464 (1961) and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

The same argument was considered and rejected by the Supreme Court of the United States in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). *Cantor* involved an antitrust challenge to an electric utility's practice of providing light bulbs to its customers without separate charge pursuant to a "lamp exchange program" that was incorporated in its rates on file with the Michigan Public Service Commission. The utility's rates, including its omission of any separate charge for the bulbs, had been approved by the Commission. Thus, as the court recognized, the defendant utility was required to continue the program until it filed and obtained Commission approval for a new tariff that did not contain that program. *Id.* at

582–583 and at 585, 96 S.Ct. at 3114 and 3115.

Not only did the court reject the contention that the Commission's approval gave rise to a *Parker v. Brown* defense, it also specifically held that the *Noerr-Pennington* was inapplicable. As the court stated, 428 U.S. at 601–602, 96 S.Ct. at 3123:

> "[N]othing in the *Noerr* opinion implies that the mere fact that a state regulatory agency may approve a proposal included in a tariff, and thereby require that the proposal be implemented until a revised tariff is filed and approved, is a sufficient reason for conferring antitrust immunity on the proposed conduct."

The *Cantor* decision is precisely on point. Defendants' purported *Noerr-Pennington* defense is not well taken.

A comparison of I & M's wholesale rates with its actual retail rates in effect during the period July 1976 to August 1978 shows that defendants required plaintiffs to pay over $4 million more pursuant to their wholesale rates than plaintiffs would have paid under I & M's actual retail rates, then in effect and charged by I & M to its non-competing retail customers.

None of I & M's proposals during the period for increased retail revenues was approved by the Public Service Commissions of Indiana or Michigan at the levels sought by the defendants. Defendants are aware that their filings for increased retail rates rest on questionable assumptions and judgments, the rejection of which will reduce I & M's retail rates. Though defendants here assert that their proposed retail rates are the only appropriate measure of their intent, the evidence shows that they do not regard these proposed retail rates to be sufficiently reliable to warrant their inclusion in their own operating forecasts. Instead, they regard their own proposed retail rates as "intangible" and "uncertain." I & M's wholesale rates are included in the company's financial projections; its proposed retail rates are not. [Disbrow deposition at 154–156]

In addition , I & M had no proposed retail rates on file with the Public Service Commissions of Indiana and Michigan during long periods of the time at issue in this case. Defendants argue that their intent is to be assessed by reference to proposed rates for these periods as well, conveniently adopting proposed retail rates that had by then been rejected as excessive by the State Public Service Commissions or rates that had not been proposed for some of the months for which they are advanced.

Measuring the disparities of defendants' dual rate structure by reference to I & M's proposed retail rates establishes a misleading standard that bears no resemblance to the real world in which plaintiffs and I & M compete. Defendants' attempt to avoid liability for their anticompetitive practices by resort to this fiction should be rejected.

Defendants offered no evidence in support of their asserted cost justification for I & M's discriminatory dual rate structure other than I & M's initial rate filings submitted to the various commissions. Because the defendants in preparing and filing new rates have refused to consider the relationship between I & M's wholesale and retail rates, I & M's initial filings before the commissions do not even attempt to establish a cost justification for the disparity between those rates.

Further, the evidence shows that none of I & M's wholesale rate filings to date have persuaded the Federal Commission that I & M's wholesale rates are just and reasonable as filed, and the Federal Commission has never approved as just and reasonable a wholesale rate under which I & M has charged any of the plaintiffs more than that municipality would pay under I & M's retail rates then in effect.

 Defendants' contention that I & M's "bad faith" is not proved by an administrative finding that the company has filed and collected excessive, unjust, and unreasonable rate is irrelevant. "Bad faith" is not required to be proved to establish a violation of the Sherman Act.

Defendant I & M's retail sales to consumers are regulated by the Public Service Commissions of Indiana and Michigan. In each state the company maintains three separate tariffs for large customers, corresponding to three levels of demand, or six retail tariffs in all. (In Indiana the tariffs are designated "IP," "QP" and "CP." In Michigan the tariffs are "LP," "QP" and "CP." In contrast, the company files before the Federal Commission one single wholesale tariff for service to all its wholesale municipal customers, including the plaintiffs. Wholesale Tariff "WS" consists of a single rate curve extending to all levels of demand and covering the range of all six of I & M's retail tariffs.

Defendants contend that the Seventh Circuit's decision in *Public Service Company of Indiana v. Federal Power Commission*, 575 F.2d 1204 (1978), prohibits the company from comparing its wholesale charges to the plaintiffs against the amounts they would have paid under I & M's retail rates, if that analysis requires it to compare different retail rates for different municipalities and results in its charging them different rates.

The evidence shows that since 1972 I & M has charged municipalities having different demands different rates, depending on their location on the rate curve under wholesale Tariff WS. [Tr. 162–165] Further the *Public Service* decision does not prohibit disparities between the rates I & M charges different municipalities in the class of wholesale customers. Rather, that case holds that any substantial disparities must be justified. *Id.*, 1212, see also *id.*, at 1212 n. 12. The promotion of competition, which is a common concern of both the federal antitrust laws and the "broadly procompetitive purposes" of Section 2 of the Federal Power Act, *Conway Corporation v. Federal Power Commission, supra,* 167 U.S.App.D.C. at 50, 510 F.2d at 1271, is more than adequate justification for comparing defendants' wholesale charges to each plaintiff against the amount that plaintiff would have paid on I & M's retail tariff for customers having the same demand, in order to remove disparities between I & M's wholesale and retail rates.

## IV.

All three defendants have participated in the violations shown by the evidence in this case. Relief against all three defendants is necessary to remedy their monopolization to date and to protect the plaintiffs against future violations.

Through defendant I & M the defendants control the electric power supply to all the plaintiff municipalities. Defendants have misused the leverage afforded by this monopoly to engage in a number of anticompetitive acts and practices.

I & M filed and collected unjust and unreasonable wholesale rates that, for considerable periods of time, required each plaintiff to pay more than it would have paid under I & M's retail rates then in effect. Service Corporation participated in setting and filing those wholesale rates, and has appeared before the Commission in support of them. Defendant AEP, which owns all the voting stock of both I & M and the Service Corporation and controls these corporations through interlocking offices and directorships as part of the integrated AEP System, benefited by the overcharges through its annual receipt of dividends from I & M.

■ All three defendants should be liable to each plaintiff for damages based on the amount of their overcharges to date. Injunctive relief against all of them to protect the plaintiffs against avoidable and unjustified overcharges in the future is necessary and appropriate in view of their integrated operations and control.

Each of these defendants participated directly in the AEP System's attempt to withdraw from the wholesale market. Each defendant issued statements to wholesale customers of the AEP System, including the plaintiffs, expressing their desire to withdraw from the wholesale market and urging their municipal customers to seek other sources of supply. Officials of the Service Corporation announced the System companies' intent to withdraw in a letter to wholesale customers, forwarded to each of the plaintiffs by I & M. Service Corpora-. tion officials also testified before the FPC in support of that policy. Defendant AEP issued a formal statement of its intent to withdraw from the wholesale market in its 1975 Annual Report.

I & M attempted, and continues to attempt, to restrict its obligation to its wholesale municipal customers to discriminatorily short time periods and limited quantities of power. Employees of both defendants I & M and Service Corporation testified before the FERC in defense of those practices. Finally, the evidence shows that all three defendants participated in the AEP System's policy of taking over municipal utilities whenever it can, and in implementing that policy in Indiana and Michigan.

The practices of all three defendants have compelled the plaintiffs to undergo time-consuming litigation and to incur litigation expenses here. Relief against all three defendants is needed to remedy the violations shown by the evidence and to prevent their monopolization in the future.

The evidence shows that the defendants through I & M have overcharged the plaintiffs both by requiring them to pay more at wholesale than they would have paid under I & M's retail rates then in effect and by requiring them to pay excessive, unjust, and unreasonable rates. Damages should be awarded each plaintiff in treble the amount of the overcharges it has paid. 15 U.S.C. § 15.

■ Proof of a monopolistic overcharge establishes both that the direct purchaser has been "injured in his business or property" within the meaning of Section 4 of the Clayton Act and the amount of the resulting damages. *Hanover Shoe, Inc. v. United Shoe Machine Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). As the court there held:

> "[W]hen a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4." *Id.* at 489, 88 S.Ct. at 2229.

See also *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262, n. 14, 92 S.Ct. 885, 891, n. 14, 31 L.Ed.2d 184 (1972); *Chattanooga F&P Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906).

The circumstances in which a *prima facie* showing may be rebutted are extremely limited. For example, in *Hanover Shoe* the defendant argued that the plaintiff's pass-on of the overcharge to its own retail customers should be considered in defense where the "economic circumstances were. such that the overcharged buyer could only charge his customers a higher price *because* the price to him was higher." *Hanover Shoe, supra*, 392 U.S. at 492, 88 S.Ct. at 2231. (Emphasis in original) The court rejected that contention, however, reasoning that such a defense would confront the antitrust plaintiff with almost insuperable difficulties of proof. *Id.* at 492–493, 88 S.Ct. at 2231.

· The court further noted that the relatively small monetary interest of consumers made it unlikely that they would seek to enforce the antitrust laws, and thus that the recognition of a pass-on defense would allow "those who violate the antitrust laws by . . . monopolizing [to] retain the fruits of their illegality because no one was available who would bring suit against them." *Id.* at 494, 88 S.Ct. at 2232. At the time *Hanover Shoe* was decided, the question of whether ultimate consumers could recover for such excessive overcharges passed through to them had not been resolved. Subsequently, however, the court held in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), that indirect consumers forced to pay higher prices as a result of a price fixing conspiracy could not sue on a pass-on theory. Thus, the concern expressed in *Hanover Shoe* has become an inevitable reality. Ultimate consumers cannot recover for overcharges passed on to them as a result of monopolistic overcharges imposed on their suppliers. Recognition of a passing-on defense to preclude the award of antitrust damages to the business entity directly subjected to a monopolistic overcharge thus would provide complete immunity for the monopolist.

Although *Hanover Shoe* recognized that there "might be situations—for instance, when an overcharged buyer has a preexisting 'cost-plus' contract", *Hanover Shoe, supra*, 392 U.S. at 494, 88 S.Ct. at 2232, where the passing-on defense might be available, the scope of that potential defense was severely limited in the *Illinois Brick* decision. After reiterating the *Hanover Shoe* concern that the pass-on defense would "add whole new dimensions of complexity to treble-damage suits and seriously undermine their effectiveness," *Illinois Brick, supra*, 431 U.S. at 737, 97 S.Ct. at 2070, the court left open only a narrow use of the pass-on defense. While acknowledging *Hanover Shoe*'s possible exception for a preexisting cost-plus contract, the *Illinois Brick* court explained that the pass-on defense might be available in that situation only because the purchaser "is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price." *Id.* at 736, 97 S.Ct. at 2070. This possible exception is thus clearly of no use to the defend-·ant here. Not only are plaintiff's sales to its customers not governed by a cost-plus contract or its analogue, there is no fixed agreement as to the amount of purchase which would insulate plaintiff from the "interaction of supply and demand that complicates the determination" of passed-on cost. *Id.* at 737, 97 S.Ct. at 2070.

Defendants have suggested that the overcharge theory of damages is not available to an antitrust plaintiff whose overcharge is established, in part, by reference to the defendant's charges to its other customers. Counsel for defendants argued in his opening statement that plaintiffs' case really was one of price discrimination. [Tr. 44] Relying on *Interstate Commerce Commission v. United States*, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933), defendants contend that recovery cannot be allowed in the absence of other evidence of loss. [Tr. 45]

Defendants' position is in error. The *Interstate Commerce* case was not an antitrust case at all. Instead, it was a mandamus proceeding in which the petitioner sought to overturn the Interstate Commerce Commission's decision not to award damages under the Interstate Commerce Act. Although the court's discussion of the damage theory in the *Interstate Commerce* case cited its earlier antitrust decision in *Keogh v. Chicago & N. W. R. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), the *Keogh* decision was limited by the court in *Hanover Shoe, supra*, 392 U.S. at 490 n. 8, 88 S.Ct. at 2230, n. 8, and the court's subsequent further limitation of the "passing-on" defense in *Illinois Brick, supra*, undercut whatever continuing vitality *Keogh* may have had. The other decisions relied on by defendants predate the Supreme Court's decision in *Hanover Shoe* and reflect an earlier adherence to the old passing-on defense that has since been firmly rejected.

Though a passing-on defense might be available against corporate plaintiffs in a few rare circumstances where the plaintiff corporation and its owners and shareholders can pass on overcharges to their customers—a distinct group—such a defense is not available against the plaintiffs in this case. Each municipal utility's customers and owners are the same. The customers, the citizens of the municipality, have the power to discontinue the electric utility if it fails to produce sufficient benefits. The utility cannot relieve itself of the anticompetitive effects of defendants' overcharges by passing on the overcharges to its customers. Any overcharge "passed on" reduces the benefits provided by the utility and increases the likelihood that the customers will decide to discontinue the utility and sell it to the defendants.

The evidence in this case establishes two kinds of monopolistic overcharge. First, during the period 1972 to 1976, I & M charged the plaintiffs rates that were in excess of the just and reasonable rates required by Section 205 of the Federal Power Act. Defendants imposed that rate on plaintiffs unilaterally and without regulatory review and superseded it by a new, higher rate prior to the Commission's adjudication of its justness and reasonableness.

The rate charged by I & M for this period was held to be unjust and unreasonable by Administrative Law Judge Lewnes in FPC Docket No. E–7740. The parties later entered into a settlement based on that decision, and the settlement proposal was accepted by the Commission. As the Seventh Circuit has recognized, refunds ordered by the Commission are not an antitrust damage remedy. *City of Mishawaka, supra*, 560 F.2d at 1325.

The evidence also shows that plaintiffs have been overcharged by the amount that their wholesale rates exceeded the rates they would have been charged on I & M's retail rates, then in effect, and that defendants have not justified this overcharge. Plaintiffs, therefore, are entitled to recover treble the amount of this overcharge as well. During the period August 1976 through August 1978, the overcharges totaled $4,049,461.97, or 12.86% of I & M's total billings to the plaintiffs. This court's order awards plaintiffs judgment against the defendants in treble that amount.

Section 16 of the Clayton Act provides:

That any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . .

Injunctive relief may be granted in addition to damages, or alone.

The evidence in this case shows that defendants' violations of the antitrust laws threaten the plaintiff municipalities with losses and damage, making injunctive relief necessary and appropriate. Defendants have been found in violation of the Federal Power Act for many of the same acts consti-

tuting their violation of the antitrust laws, specifically for attempting to withdraw from the wholesale market [FERC Docket No. E–9548] and for attempting to limit I & M's obligation to serve its municipal customers to short time periods and to discriminatorily restricted quantities of power. [FERC Docket No. ER76–792]. In every instance, defendants have appealed those findings and orders to the FERC, thereby relieving themselves of the present obligation to comply with the judges' remedial orders. The defendants' appeals have required the plaintiffs to continue to litigate in defense of those decisions and have prolonged the plaintiffs' uncertainty about the continuity and adequacy of their supply of electric power.

Defendants, who control the supply of power to plaintiffs' municipalities, also have filed and charged the plaintiffs unjust and unreasonable wholesale rates and have required all plaintiffs during the past two years to pay over $4,000,000 more at wholesale than they would have paid under I & M's retail rates. Defendants have not attempted to avoid the overcharges as required by Section 205 of the Federal Power Act under the Supreme Court's decision in *Conway.*

The Court of Appeals for the Seventh Circuit already has indicated *in this case* that plaintiffs' establishment of an antitrust violation may entitle them to broad injunctive relief. As that court stated, on proof of plaintiffs' case, "The district court presumably would order defendant to file a new wholesale rate application that would remove the disparity between the rates charged plaintiffs and defendants' industrial customers." *City of Mishawaka, supra,* 560 F.2d at 1323. The court further noted:

> "The antitrust and regulatory regimes accommodate and supplement each other in order to provide full protection from anticompetitive practices. Here . . . the remedies afforded under the two statutes can be meshed." *Id.*

The Seventh Circuit held that injunctive relief may be appropriate even if the challenged wholesale rates were found to be just and reasonable by the Federal Commission. *Id.* at 1324. That, however, is not the case; none of I & M's wholesale rates here at issue have ever been found to be just or reasonable. To the contrary, every decision by the Administrative Law Judges of the Federal Commission with respect to the rates and practices here at issue has found them to be excessive, unjust, unreasonable, and unduly discriminatory.

The defendants' continued overcharges, shown by the evidence, themselves threaten all of the plaintiffs with losses and damage making injunctive relief necessary. Despite the probability that plaintiffs will receive refunds from the FERC eventually, it is clear that the defendants' depriving the plaintiffs of the amount of the overcharges during the long periods of time required to obtain those refunds, causes the plaintiff municipalities and their citizens to lose benefits they otherwise would obtain from the use of those funds during that time.

The evidence also shows that defendants are sufficiently likely to continue their anticompetitive acts and practices to warrant injunctive relief. As plaintiffs have established, the Federal Power Act's prohibition against the defendants' maintaining any unreasonable difference in rates includes the obligation to avoid such differences between wholesale and retail rates. Though this was clearly indicated by the *Conway* decisions, the evidence clearly shows that the defendants have ignored *Conway* in preparing and filing the wholesale rates imposed on the plaintiffs.

The Federal Energy Regulatory Commission's recent decision in *Missouri Power & Light Co., supra,* holds that the absence of "relative parity" between actual wholesale and retail rates creates a presumption that the wholesale rate is unduly discriminatory. *Missouri Power* represents the Commission's first considered statement of the manner in which the Federal Power Act is to be interpreted in light of *Conway,* and overrules several prior decisions of FERC Administrative Law Judges that appeared to be more tolerant of "price squeezes."

The Seventh Circuit's decision *in this case* underscored defendant I & M's obligation to avoid anticompetitive practices where possible. *City of Mishawaka, supra,* 560 F.2d at 1320. In spite of this, and of the obvious complementary relationship between defendants' *Conway* obligation to avoid undue discrimination between their wholesale and retail rates and their antitrust obligation to avoid exclusionary practices, defendants did not even consider the relationship between their wholesale and retail rates when they prepared and filed their wholesale rates in 1976 and 1978. Their willful disregard of their legal obligations could not be clearer.

Defendants' past rate practices, their present attitude toward their Federal Power Act obligation as interpreted by the *Conway* and *Missouri Power* decisions, their disregard of the Seventh Circuit's emphasis in this case on I & M's duty to avoid anticompetitive acts and practices, and the Commission's inability to require prospective adherence to the Power Act point to one conclusion: unless enjoined by this court, defendants will continue to ignore their obligations under the Federal Power Act and the antitrust laws and will continue to file and charge unjust and unreasonable wholesale rates in excess of comparable retail rates and to charge those rates until they are superseded by even higher rates. These practices will continue to injure plaintiffs in their business and property, and will insure that the plaintiffs' own rates to their customers are raised by the monopolistic overcharges imposed on them.

Here the Sherman Act and the Federal Power Act can easily be "meshed." *City of Mishawaka, supra,* 560 F.2d at 1323. As the Court of Appeals for the District of Columbia acknowledged, Title II of the Federal Power Act, which contains the Section 205 prohibition against discrimination between wholesale and retail rates, was enacted to serve "broadly procompetitive purposes." *Conway Corp., supra,* 510 F.2d at 1271. The federal antitrust laws serve that same purpose. Each compels defendants at least to consider the relationship and competitive impact of wholesale and retail rates and to refrain from their discriminatory anticom-

petitive practices where possible. The court should order them to do so.

As the *Cantor* decision indicates, there is no *Noerr-Pennington* defense in this case. The basic purpose of the *Noerr-Pennington* doctrine is to assure access to the political system, the judicial system, and state and federal agencies. *California Motor Transport Co. v. Trucking Unlimited,* 405 U.S. 508, at 511, 92 S.Ct. 609, at 612, 30 L.Ed.2d 642 (1972). Here, the court can grant an injunctive remedy that will afford plaintiffs protection against the anticompetitive impact of defendants' practice of charging wholesale rates in excess of comparable retail rates for substantial periods of time and, at the same time, will allow I & M to properly seek rate increases whenever it chooses.

This court's order requires the defendants, in preparing and filing new wholesale rates for electric service to any of the plaintiff municipalities, (1) to project the "filing" determinants for each plaintiff for the first year the new wholesale rate will be in effect, and (2) to compare the projected wholesale billings to each plaintiff against the amount that plaintiff would pay under I & M's retail rates in effect at the time the wholesale rate is filed. I & M is enjoined not to put into effect or charge any of the plaintiffs a wholesale rate under which the projected wholesale billings to any plaintiff would exceed the amount that plaintiff would pay under I & M's retail rates, unless and until the Federal Energy Regulatory Commission determines that the wholesale rate is just and reasonable.

Nothing in this decree would prohibit I & M from filing a new wholesale rate higher than its retail rates, if the company puts the wholesale rate into effect prospectively by requesting that the effective date be deferred [18 CFR Section 35.3(a)] until the Commission has adjudicated the justness and reasonableness of that rate and if the company charges the plaintiffs only the just and reasonable rate, whatever that eventually may be. Nothing in the decree prevents the defendants from designing I &

M's rates so as to eliminate any disparity between I & M's rates so as to eliminate any disparity between I & M's wholesale and retail rates. Nothing prevents the defendants from timing the filing of I & M's wholesale rates so as to avoid charging any of the plaintiff municipalities more at wholesale than it would have paid under I & M's retail rates in effect. All of the foregoing procedures for eliminating the disparity between I & M's higher wholesale and lower retail rates are available to the company under the decree and the Federal Power Act. The question here simply is whether the court can and should compel the defendants, proved violators of the antitrust laws, to resort to those alternatives when rate increases are needed. The Seventh Circuit's presumption that even more sweeping remedies would be awarded demonstrates that this court can grant such relief. The facts established at trial clearly indicate that it should.

This relief would protect the plaintiffs against the anticompetitive impact of defendants' excessive wholesale rates during the long period of time usually required for FERC finally to adjudicate these rates and set them at the just and reasonable level. In effect the relief in the court's order would shift the burden of excessive and exclusionary rates from the plaintiffs onto the defendants, where it belongs.

Sections 4 and 16 of the Clayton Act provide that prevailing plaintiffs should be awarded their costs of suit, including a reasonable attorney fee. 15 U.S.C. § 15; 15 U.S.C. § 26 as amended by P.L. 94–435, September 30, 1976. Section 4 of the Clayton Act provides that a plaintiff proving injury to his business or property "shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. The Hurt-Scott-Rodino Antitrust Improvements Act of 1976, P.L. 94–435, September 30, 1976, amended Section 16 to provide as follows:

"In any action under this section in which the plaintiff substantially prevails, the court shall award the costs of suit, including a reasonable attorney's fee, to such plaintiff."

The provision for the award of attorneys fees in Section 4 predated the institution of any of the litigation that was consolidated into this case. However, the comparable provision in Section 16 was not added until after the institution of Civil Actions S 74–72 and S 75–210.

In *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Supreme Court of the United States reiterated the established principle that the federal courts should apply the law in effect at the time they render their decisions, unless that would result in manifest injustices or unless the applicable legislation or its history contains a direction to the contrary. *Id.,* at 711, 94 S.Ct. at 2016. The *Bradley* court therefore held that the provision of the Education Act Amendments of 1972, enacted after that case was submitted on appeal but before it was decided, was applicable, and that the plaintiff in *Bradley* was entitled to recover attorneys' fees under that statute.

The legislative history of the 1976 amendment to Section 16 of the Clayton Act indicates that Congress expressly contemplated that the amendment was intended to apply to cases instituted prior to its enactment. During the Senate debates, Senator Abourezk asked Senator Hart, for whom the legislation was named, whether the attorneys' fee amendment was to apply to cases instituted prior to the amendment. The following exchange resulted:

"Does this mean that following the usual rule, as in such cases as *Bradley v. School Board of the City of Richmond,* 416 U.S. 696 [94 S.Ct. 2006, 40 L.Ed.2d 476] (1974), actions brought prior to the date of enactment, will still be eligible for such attorneys' fees awards?

"MR. PHILIP A. HART. The answer is 'yes,' under that case and a number of other comparable cases. Cong.Rec.S.8960 (daily ed. June 10, 1976) (94th Cong. 2d Sess.)"

This quotation is set forth in full in *Alphin v. Henson,* 552 F.2d 1033, 1035 n. 3 (4th Cir.

1977), *cert. den.* 434 U.S. 823, 98 S.Ct. 67, 54 L.Ed.2d 80, the Fourth Circuit awarded attorney's fee to a plaintiff who had won injunctive relief but failed to prove damages in antitrust litigation instituted and decided by the District Court prior to the enactment of that amendment. Although the *Alphin* case had proceeded through the District Court, the mandate of the Court of Appeals had not issued prior to the amendment of Section 16 of the Clayton Act. Since the case was still in appellate litigation, the Court of Appeals ordered the award of fees based on that amendment.

The *Alphin* court's conclusion that the award of attorney fees would not result in manifest injustice is equally applicable here. As in *Alphin,* here the plaintiffs' persistent efforts will "have successfully vindicated the public interest and public policy expressed in the antitrust laws by bringing . . . monopolists to heel." *Id.* at 1034–1035. Fees and costs for the appellate litigation *in this case* also are appropriate, since the affirmance of this court's jurisdictional ruling was essential to plaintiffs' ultimate success on the merits. See, *e. g., Perkins v. Standard Oil Co.,* 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 434 (1970); *Alphin v. Henson, supra,* 552 F.2d at 1036.

The grant of relief either on plaintiffs' damage claim or on their claim for injunctive relief entitles the plaintiffs to an award of costs and fees. The plaintiffs will "substantially prevail" if the *court* grants the injunctive relief sought, or similar injunctive relief, since the end result will be finally to compel the defendants to recognize and honor their obligations under the antitrust laws and under the Federal Power Act.

█ Consistent with its ruling during the trial of this case the award of costs and attorney fees are limited *to this case,* including the interim appeal taken by the defendants but exclude costs and fees incurred by the plaintiffs in the proceedings before the Federal Energy Regulatory Commission.

## V.

Defendant I & M's counterclaims are baseless. Its First, Second, Third, and Fifth Counterclaims, attacking the plaintiffs' filing and maintaining this action, are barred both by the effect of the court's ruling denying defendants' motion to dismiss at the close of plaintiffs' case, and by the company's failure to offer any evidence in support of the counterclaims thereafter. In addition, by I & M's own admission, its first four counterclaims are premised on competition between plaintiffs and I & M that defendants claim does not exist.

This court's ruling rejecting defendants' motion to dismiss at the close of plaintiffs' case [Tr. 878] has put to rest defendant I & M's claim that plaintiffs are engaged in sham litigation. The result announced here confirms that conclusion.

Defendant I & M's First, Second, Third and Fifth Counterclaims are directed at plaintiffs' institution and maintenance of this litigation. The first three counterclaims contend that plaintiffs themselves have violated the antitrust laws by instituting antitrust litigation. The Fifth Counterclaim is premised on a contract theory, apparently asserting that plaintiffs' 1968 election to be served on tariff MRS included an agreement by the plaintiffs perpetually to forego antitrust litigation.

█ The *Noerr-Pennington* doctrine precludes the imposition of antitrust liability on parties who resort to the courts in good faith to press what they believe to be legitimate grievances. As the Supreme Court of the United States stated in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972):

> "We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of views respecting resolution of their business and economic interests vis-a-vis their competitors."

Accordingly, antitrust liability for the institution and maintenance of litigation can only be imposed in cases in which the evidence reveals that the challenged lawsuit is a "mere sham to cover with is nothing more than an attempt to interfere directly with the business relationships of a competitor," *id.,* at 511, 92 S.Ct. at 612, *quoting Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 864 (1961). The court's ruling that plaintiffs have proved a *prima facie* case bars I & M's First, Second and Third Counterclaims as a matter of law. The testimony of S. A. Brett disposed of I & M's contention that this litigation was instituted without probable cause and regardless of the merits. [Tr. 163–165] The court's subsequent ruling rejecting defendants' motion to dismiss confirmed the legitimacy of this case. As the court there stated, this case would have been submitted to the jury had it been a jury trial. [Tr. 878]

I & M's counterclaims have not been proved. Plaintiffs are entitled to judgment denying them for failure of proof.

Defendant I & M's First and Second Counterclaims are based on its assertion that plaintiffs filed this case for the purpose of causing I & M to discriminate in price between plaintiffs and I & M's other municipal wholesale customers who are not parties to this litigation. I & M's Third Counterclaim asserts that plaintiffs filed this case for the purpose of forcing I & M to discriminate in price between plaintiffs and I & M's retail customers. I & M has introduced no evidence in support of these claims, and there is none.

The Federal Energy Regulatory Commission's recent decision in *Missouri Power & Light Co.,* FERC Docket No. ER 76–539 (October 27, 1978), indicates that wholesale rates not in "relative parity" with retail rates are presumed to be discriminatory under the Federal Power Act, and that the utility bears the burden of justifying any such disparity. The relief plaintiffs seek would not compel defendants to offer wholesale rates lower than comparable retail rates if that disparity was not justified under the Federal Power Act. Nor would it prevent them from attempting to justify a wholesale rate in excess of retail to the FERC. It would, however, preclude defendants from continuing to charge unjust and unreasonable wholesale rates in excess of the comparable retail for the substantial periods of time required for the FERC to adjudicate those rates and return them to the just and reasonable level. Moreover, it would compel defendants themselves to comply with the Federal Power Act in the first instance instead of repeatedly filing unjust, unreasonable and discriminatory rates and putting the burden of remedying them in each case entirely on the Commission.

The essence of I & M's Fourth Counterclaim, which is maintained only against plaintiff Gas City, is that Gas City has improperly annexed territories adjacent to its boundaries and thereby expanded the area served by Gas City's municipal electric utility at I & M's expense. Though the company has attempted to characterize this counterclaim as one directed at an alleged policy of tying Gas City's water and sewage services to its electric utility service, its real complaint is that Gas City's annexation of adjacent properties has displaced I & M's retail sales of electric power in those areas. The evidence clearly establishes that Gas City had not required that any customer located outside its boundaries who takes its water or sewage services also purchase electric power from Gas City's municipal electric utility. Moreover, the evidence shows that alternate sources of water are available to entities inside and outside Gas City and that one Gas City industry, the Owens-Illinois plant, has provided its own water service for some 900 employees. Similarly, the evidence shows that septic tanks can and are used as an alternative to municipal sewage services.

Gas City's annexation policy, and the manner in which its water and sewage services allegedly serve that policy, are the real practices at issue in this counterclaim. There is, however, no evidence that any of

Gas City's policies are in violation of applicable Indiana statutes. All of Gas City's policies and practices are and have been pursued in accordance with State law, and there is no allegation to the contrary. Indeed, Indiana law specifically requires that municipalities that extend their sewage services require, as a condition of extending that service, that the recipient not remonstrate against subsequent annexation. [Ind.Code Ann. § 19–2–7–16 (Burns)]

A municipal annexation policy is not a "product" within the meaning of Section 1 of the Sherman Act or "goods, wares, merchandise, machinery, supplies, or other commodity" within the meaning of Section 3 of the Clayton Act. The evidence fails to establish that Gas City has illegally tied the receipt of any product or commodity to the purchase of another. I & M therefore has failed to prove its Fourth Counterclaim.

Even if proved, Gas City's alleged "tying" of electric service to water and sewer service would be exempt from antitrust liability under the doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

The court held in *City of Lafayette* that municipalities are not immune from antitrust liability under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307 (1943), simply by reason of their status as a subdivision of the state. *City of Lafayette, supra,* 435 U.S. 400, 98 S.Ct. at 1134. The court recognized, however, that its holding "does not necessarily mean that all of their anticompetitive activities are subject to antitrust restraints." *Id.,* at 414, 98 S.Ct. at 1137. Indeed, the court held that the *Parker* doctrine precludes liability for anticompetitive conduct engaged in by the State as sovereign "or by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* (emphasis added)

The court stated that evidence that the State had "authorized or directed a given municipality to act as it did" would indicate that the resultant restraints on competition were those resulting from the state acting as sovereign and thus immune from antitrust liability under *Parker. Id.,* at 414, 98 S.Ct. at 1137. See also *id.,* at 415, 98 S.Ct. at 1138. It further held that a municipality relying on such state authority need not point to specific and detailed statutory authorization. Sufficient authority instead can be implied from a general statutory mandate "to operate in a particular area,"

> *"This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a Parker defense to an antitrust suit.* While a subordinate governmental unit's claim to *Parker* immunity is not as readily established as the same claim by a state government sued as such, we agree with the Court of Appeals that *an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'"* *Id.,* at 415, 98 S.Ct. at 1138 (Emphasis added)

The relevant Indiana statutes show that the State of Indiana has authorized its municipalities to operate as exclusive monopolies of electric, water, sewer, and other utilities. See Indiana Code Ann. § 8–1–2–90 (Burns). Indiana law also specifically authorizes municipalities to annex territories adjacent to their boundaries in accordance with statutory procedures, Indiana Code Ann. § 18–5–10–19 *et seq.* (Burns), thereby enabling them to expand their own municipal utilities and to replace the public utilities that may be providing service there. Finally, Indiana law specifically *requires* that cities extending their storm, sanitary and sewer services to property owners in areas adjacent to their boundaries obtain, as a condition of the extension of that service, the property owners' agreement not to remonstrate against pending or future annexations. As Indiana Code § 19–2–7–16 states:

> The contract [extending these municipal services] *shall include as part of the con-*

*sideration running to the city or town, the release of the right of the owners party thereto and their successors in title to remonstrate against pending or future annexations to the city or town of the area served by the sewers and facilities,* and any person tapping into or connecting to the sewers and facilities contracted for, shall be deemed to thereby waive their rights to remonstrate against the annexation of the area served by the sewers and facilities. (Emphasis added)

The statutory authorization given Gas City and other municipalities to operate their own utilities is more than adequate to give rise to the *Parker* defense recognized and preserved in *City of Lafayette.* These grants clearly evidence the Indiana legislature's adoption of a state policy that allows each municipality to displace regular competition with "monopoly public service," *City of Lafayette, supra,* 435 U.S. at 414, 98 S.Ct. at 1137, and to authorize the municipalities to determine which of the utility services they wish to operate themselves and which services they will allow private utility companies to provide within their city limits. Moreover, Gas City's policy of requiring adjacent property owners accepting its sanitary and sewer services to agree not to remonstrate against future annexation is not only authorized by Indiana law, it is required. Gas City's alleged activities are thus clearly exempt from antitrust liability.

 Even assuming I & M's Fourth Counterclaim were meritorious, the company has not attempted to prove any compensable damages. In order to recover damages, an antitrust plaintiff must establish injury and demonstrate the amount of damages it has sustained. Damages must be proved with sufficient particularity to allow a reasonable estimate as the basis for an award; treble damages cannot be based on speculation. See generally *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946); *Bendix Corp. v. Balax, Inc.,* 471 F.2d 149, 163 (7th Cir. 1972).

Defendants rested their case without introducing any evidence from which the court could measure or quantify I & M's alleged damages. Although I & M has asserted that Gas City's alleged practices have caused it to lose customers, it offered no proof that would allow the Court to determine the amount of damages that allegedly resulted. For that reason alone, I & M's prayer for damages on its Fourth Counterclaim is denied.

Defendant I & M's Fifth Counterclaim appears to advance the proposition that plaintiffs' 1968 election to be served pursuant to wholesale tariff MRS also included an agreement on the part of the plaintiffs to forego any antitrust challenge to defendants' activities. Defendant I & M claims that plaintiffs' institution of Civil Actions No. S 74–72, S 75–210 and S 77–209 was "calculated to deprive I & M of the benefit of its bargain under the 1968 agreements" and that each case was instituted without reasonable basis in fact or in information or belief. Presumably this release from antitrust liability was to be perpetual; I & M has suggested no termination date after which its practices might again be subject to antitrust scrutiny.

To the extent that I & M's Fifth Counterclaim rests on a claim of sham litigation, it fails. To the extent that I & M's Fifth Counterclaim is based on the existence of some agreement constituting a prospective release from antitrust liability, it fails both on the facts and on the law. Such a claim cannot be proved. There was no such agreement, and the company has offered no evidence of one. Even if proved, such an agreement would be void as a matter of law.

I & M may contend that plaintiffs' "promise" to refrain from antitrust litigation is implied by the 1968 agreements, for the company has introduced no other evidence from which such a promise might be inferred. However, the 1968 agreements contain no prospective release from antitrust liability.

 A release is generally a written agreement manifesting the intention of one party to discharge another from an existing or asserted duty. Calamari & Perillo, *Contracts* 529 (1972); 5A Corbin, *Contracts*

§ 1238 (1963); Restatement, *Contracts* § 402(1) (1932). While no particular language is required to make a written release effective, it is necessary that the words show an intention to discharge. *Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 263 (2d Cir. 1965).

Rules of construction generally mandate narrow interpretation of releases and require the resolution of ambiguities against the draftsman. *Redel's Inc. v. General Electric Co.,* 498 F.2d 95, 100 (5th Cir. 1974). In view of the recognized importance of private antitrust suits in the enforcement of the antitrust laws, see, e. g., *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 336, 91 S.Ct. 795, 805, 28 L.Ed.2d 77 (1971), this principle applies with particular force in this case. In cases in which such releases may run counter to federal antitrust policy, the necessity for clarity and specificity for releases from antitrust liability is heightened. As the Fifth Circuit stated, "While not an absolute requirement, antitrust policy certainly encourages the parties to a general release to evidence their intention to release antitrust claims." *Id.,* at 498 F.2d 101.

No such intention can be found in plaintiffs' 1968 elections to be served on tariff MRS. Those agreements do not even contain a general release, much less a release from antitrust liability. Having failed to produce any other evidence, I & M has either abandoned this claim or failed to establish it as a matter of fact.

Although an antitrust release may effectively bar antitrust claims which arose from transactions prior to the discharge, it may not be applied prospectively. This doctrine is well established in the federal courts. *E. g., Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 896 n. 7 (3d Cir. 1975); *Redel's Inc. v. General Electric Co., supra,* 498 F.2d at 99; *Gaines v. Carrollton Tobacco Board of Trade, Inc.,* 386 F.2d 757, 759 (6th Cir. 1967); *Fox Midwest Theatres, Inc. v. Means,* 221 F.2d 173, 180 (8th Cir. 1955); *Hunt v. Mobil Oil Corp.,* 410 F.Supp. 10, 27 n. 59 (S.D.N.Y.1975); *Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.,* 338 F.Supp. 1019, 1022 (S.D.Tex.1972). The reason for such a ban was stated succinctly in *Fox, supra,* 221 F.2d at 180:

"Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. This is because the effect of such a release could be to permit a restraint of trade to be engaged in which would have impact, not simply between the parties, but upon the public as well. Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract 'in restraint of trade'. Section 1 of the Sherman Act Anti-Trust Act. 15 U.S.C.A. § 1, of course, brands all contracts in restraint of trade as 'illegal'." (Citations omitted.)

The alleged agreements purportedly relied on by I & M not only do not exist, they could not be valid as a matter of law. I & M's Fifth Counterclaim is without basis in either law or fact, and therefore is denied.